UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/2/2022___
```

---

BRAD HODNETT AND CYNTHIA HODNETT,
Individually and Derivatively on Behalf of
PIPINGusa, LLC,

                              Plaintiffs,

                    -against-

MEDALIST PARTNERS OPPORTUNITY
MASTER FUND II-A, L.P., MEDALIST
PARTNERS, L.P., GREGORY PETER RICHTER,
MARC THALACKER, MARK THEETGE, MARY
L. GRAYBEAL and KRAH USA LLC,

                              Defendants.

---

1:21-cv-00038 (MKV)

**OPINION AND ORDER
DENYING MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Brad Hodnett and Cynthia Hodnett ("Plaintiffs"), bring this action individually and derivatively on behalf of PIPINGusa LLC ("PIPINGusa"), against Defendants Medalist Partners Opportunity Master Fund II-A, L.P. ("Medalist Fund"), Medalist Partners, L.P. ("Medalist Partners"), and Gregory Peter Richter (collectively, the "Medalist Defendants"), and Marc Thalacker, Mark Theetge, Mary L. Graybeal, and Krah USA, LLC ("Krah USA") (collectively, the "Krah Defendants") alleging, *inter alia*, claims for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets. (Second Amended Complaint ("SAC") [ECF No. 70]). All Defendants have filed a joint Motion to Dismiss Plaintiffs' Second Amended Complaint. [ECF No. 71]. For the reasons stated below, Defendants' motion is denied.

## BACKGROUND

### I.   Factual Background

The following facts are taken from the SAC and are accepted as true for the purposes of

this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

> A.   *The Hodnetts Agree To Form A New Business*
>      *With Thalacker, Theetge, And Graybeal*

In September 2019, Thalacker, an Oregon resident with extensive knowledge of water

irrigation and piping systems, approached Brad Hodnett about creating a company that would

manufacture high-pressure, high-density polyethylene piping ("HDPE/PP") pipes in Central

Oregon, for sale and distribution throughout the western United States.  (SAC ¶¶ 13, 22, 59).[1]

Thalacker, who lacked private sector or finance experience, reached out to Brad and Cynthia

Hodnett to assist with the finance and accounting side of the business.  (SAC ¶ 23).  The

Hodnetts agreed with Thalacker (and his significant other, Graybeal) to build a new business —

PIPINGusa.  (SAC ¶ 24)  Thalacker agreed to contribute a draft business proposal to their joint

venture, which the Hodnetts would, and did, work to adapt.  (SAC ¶ 23).

Plaintiffs allege that the Hodnetts came to an agreement with Thalacker and Graybeal to

divide ownership of PIPINGusa such that the Hodnetts would own a 50% interest and Thalacker

and Graybeal would collectively own the other 50% interest.  (SAC ¶ 24).[2]  The parties also

agreed that Graybeal and the Hodnetts would be officers of the company and that Cynthia

Hodnett would serve as Managing Member.  (SAC ¶ 24).  The parties also later agreed that

---

[1] HDPE/PP pipes are more environmentally friendly, more durable, last twice as long, and are more cost effective than traditional steel piping.  (SAC ¶¶ 2, 22).

[2] According to the SAC, Thalacker agreed that his share of the company would "technically" be owned by his significant other, Graybeal.  (SAC ¶ 24).  The parties agreed that Thalacker would technically serve as a paid "consultant" to the company.  (SAC ¶ 24).  Nonetheless, the SAC alleges that Thalacker jointly controlled this 50% interest together with his significant other, Graybeal.  (*See* SAC ¶ 24).

2

Theetge, who had helped Thalacker develop the original business plan and was seasoned in the water piping industry, would be given a non-voting membership in PIPINGusa and would be installed as its President.  (SAC ¶¶ 24–25).  The parties thereafter agreed to share the company's profits and losses 37.5%, 37.5%, and 25% between the Hodnetts, Thalacker and Graybeal, and Theetge respectively.  (SAC ¶ 25).  The parties also decided that, although they would jointly control the company, the Hodnetts primarily would be responsible for the financial and business strategy side of the business and Thalacker, Graybeal, and Theetge primarily would be responsible for operations, including building the manufacturing plant, engineering, and the technical side of the venture.  (SAC ¶ 26).  Thalacker also took the lead in negotiating a lease for a manufacturing site with the City of Prineville in Oregon.  (SAC ¶ 26).

After the parties agreed to form this new company, the Hodnetts worked with Thalacker and Graybeal to substantially revise the previous business plan and *pro forma* financial projections for the company, transforming it from a public-private partnership into a private company.  (SAC ¶ 28).  They estimated that they needed to obtain initial financing from investors of approximately $15 million in order to launch PIPINGusa's operations.  (SAC ¶ 28).

### B.   PIPINGusa Shares Its Confidential Information With Medalist Pursuant To The Confidentiality Agreement

At the same time that the Hodnetts, Thalacker, Graybeal, and Theetge were negotiating the formation of PIPINGusa, Brad Hodnett started investigating potential financing partners for PIPINGusa.  (SAC ¶ 29).  Brad Hodnett approached Greg Richter, CEO of Medalist Partners, a private equity firm in New York.  (SAC ¶ 29).  To facilitate negotiations regarding financing, the Medalist Defendants requested that the Hodnetts sign a Confidentiality Agreement (the "Confidentiality Agreement").  (SAC ¶¶ 30, 98; Decl. of Brad Hodnett ("Hodnett Decl."), Ex. 14

("Confidentiality Agreement") [ECF No. 22-14]).[3]  Pursuant to the Confidentiality Agreement,

PIPINGusa would share its business plan and all related documents and information with the

Medalist Defendants, which the Medalist Defendants would then use to decide whether to fund

PIPINGusa.  (SAC ¶ 30; Confidentiality Agreement, Whereas).

        Under the terms of the Confidentiality Agreement, neither PIPINGusa nor the Medalist

Defendants could disclose confidential information received from the other party to any person

outside the scope of the Confidentiality Agreement or use confidential information received

except for the purpose of the Medalist Defendants' potential investment in PIPINGusa.

(Confidentiality Agreement ¶ 3(a)).  Confidential information was defined as "all respective

confidential and proprietary information of [the Medalist Defendants or PIPINGusa] shared . . .

with each other, whether owned by [the Medalist Defendants, PIPINGusa], or third parties."

(Confidentiality Agreement ¶ 2).  The Agreement also contained a non-circumvention provision,

which stated:

> In addition to the non-disclosure obligations contained herein, each
> Party also agrees that it shall not contact any party disclosed as
> Confidential Information to the receiving Party solely in respect of
> the Potential Transaction with the intent to prevent a Party from
> interfering with the other Party's efforts to (i) consummate the
> Potential Transaction or (ii) pursue the Potential Transaction
> without the involvement of the other Party.

(Confidentiality Agreement ¶ 9).

        In reliance on the Confidentiality Agreement, PIPINGusa provided the Medalist

Defendants with significant information and details about, among other things, PIPINGusa's

---

[3] The Confidentiality Agreement and its terms are incorporated by reference in the Complaint.  (SAC ¶¶ 30–32).
Accordingly, the Court may consider it on this motion to dismiss.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220,
234 (2d Cir. 2016) (where a document is "an embodiment of" an alleged contract and "integral to the complaint," it
is "incorporated into the complaint by reference" even if not attached to the complaint and may be considered on
motion to dismiss for failure to state a claim).

business plan, financial projections, potential sales, its research and knowledge regarding

HDPE/PP piping technology, the market for this technology, the proposed lease with the City of

Prineville for PIPINGusa's manufacturing facility, and the terms of an exclusive supply contract

that PIPINGusa was negotiating with Krah GmbH ("KHB"), a German company that had

proprietary technology to fabricate water irrigation systems utilizing HDPE/PP piping.  (SAC

¶¶ 22–24, 33).  In late November, the Medalist Defendants tentatively agreed, subject to due

diligence, to provide the $15 million in financing that PIPINGusa needed in order to purchase the

piping and enter into the exclusive supply contract with KHB.  (SAC ¶ 36).

    Because the parties had agreed that the Hodnetts primarily were in charge of the

business/financing side of PIPINGusa, the Hodnetts began working to provide the Medalist

Defendants with the paperwork required to document the financing arrangement so that

PIPINGusa could sign the exclusive supply agreement with KHB and begin operations.  (SAC

¶¶ 42–43).  This included hiring lawyers and accountants, opening a bank account on behalf of

the company, and completing the company's official formation in early December 2019.  (SAC

¶ 43).  Plaintiffs allege that the Hodnetts consulted with Thalacker, Graybeal and Theetge before

taking each of these actions and that they agreed with each step.  (SAC ¶ 43).

    The Hodnetts, Graybeal, Theetge and Thalacker all agreed that Cynthia Hodnett would

arrange for PIPINGusa's official formation as a Delaware LLC, which she completed on

December 2, 2019.  (SAC ¶ 44).  Though the certificate of formation for PIPINGusa only listed

the Hodnetts as members (*see* Hodnett Decl., Ex. 39 [ECF No. 22–39] (certificate of

formation)),[4] Plaintiffs allege that Graybeal and Theetge agreed to be members of PIPINGusa

---

[4] This Court may take judicial notice of PIPINGusa's certificate of formation.  *See A.F. by & Through Fogel v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534, 545 n.11 (S.D.N.Y. 2018) (taking judicial notice of State of Delaware Certificate of Ownership); *Goldman v. Barrett*, No. 15 Civ. 9223 (PGG), 2017 WL 4334011, at *1 n.3 (S.D.N.Y.

and that they made an associated capital contribution to the company both prior to the formation of the LLC and afterwards.  (SAC ¶ 44).

### C. PIPINGusa Signs The Supply Agreement With KHB After Medalist Confirms That It Will Fund The Deal

After receiving a commitment from the Medalist Defendants that it would provide the $15 million in funding, PIPINGusa invited Bulent Kuzkaya, a representative from KHB, to travel from Germany to New York in order to meet with the Hodnetts, Theetge, and the Medalist Defendants and so that the parties could execute the exclusive supply agreement.  (SAC ¶ 48).

The parties held a meeting at the Medalist Defendants' office in New York on December 10, 2019.  (SAC ¶ 49).  At the meeting, Plaintiffs allege that Richter, acting on behalf of the Medalist Defendants, directed PIPINGusa to sign the agreement with KHB, based on the Medalist Defendants' promise and oral agreement that the Medalist Defendants would fund the deal.  (SAC ¶ 49).  Plaintiffs allege that Theetge, then acting as President of PIPINGusa, executed the Contract of Cooperation and Equipment & Know-How Supply with KHB on PIPINGusa's behalf, in reliance on the promises made by Richter and the Medalist Defendants. (SAC ¶ 49).

### D. Thalacker, Theetge, and Graybeal End Their Relationship With The Hodnetts And Form Krah USA

Two days after the December 10, 2019 meeting, Theetge, Graybeal, and Thalacker formed Krah USA, a competitor to PIPINGusa.  (SAC ¶ 53).  Several days later, the Medalist Defendants agreed to provide funding to Krah USA instead of PIPINGusa.  (SAC ¶¶ 50, 54). Without that funding, PIPINGusa was no longer able to fund the contract it had executed with

---

July 25, 2017), *aff'd*, 733 F. App'x 568 (2d Cir. 2018) (taking judicial notice of Pennsylvania Secretary of State records concerning corporate formation and dissolution).

KHB and that deal fell through.  (SAC ¶ 50).  Plaintiffs allege that Theetge, Thalacker and

Graybeal, then agreed to abandon PIPINGusa and divert its contracts and opportunities,

including the contract with KHB, to Krah USA.  (SAC ¶ 56).  Plaintiffs allege that Krah USA

entered into the same exclusive supply agreement with KHB that PIPINGusa had entered into

just days earlier, and Plaintiffs further allege, on information and belief, that the Medalist

Defendants, acting through Medalist Fund, provided the financing for the new transaction.  (SAC

¶ 57).  Soon thereafter, Krah USA also signed a lease for a manufacturing site that Thalacker had

previously negotiated on behalf of PIPINGusa.  (SAC ¶ 58).

## II.    Procedural History

On November 23, 2020, Plaintiffs commenced this action in the Commercial Division of

the Supreme Court of the State of New York, New York County, by filing the Complaint and a

proposed order to show cause seeking a temporary restraining order ("TRO") and a preliminary

injunction.  [ECF No. 1].  Two days later, after a hearing with all parties present, the state court

(Sherwood, J.) entered an Order declining to sign Plaintiffs' proposed order to show cause and

denying Plaintiffs' application for a preliminary injunction without prejudice on the grounds that

Plaintiffs had inexcusably delayed in seeking injunctive relief and failed to show irreparable

harm.  [ECF No. 1-4 at 18–19].

The case was timely removed to this Court on January 4, 2021.  [ECF No. 1].  About ten

days later, Plaintiffs again filed a proposed order to show cause seeking a preliminary injunction.

[ECF Nos. 19–22].  The Court declined to sign the proposed order to show cause given

Plaintiffs' pattern of delay and Justice Sherwood's decision denying Plaintiffs' earlier, similar

application.  [ECF No. 28].  Thereafter, after a hearing on Plaintiffs' motion for a preliminary

injunction, the Court denied Plaintiffs' motion on the grounds that the application was foreclosed

by the law of the case doctrine and that Plaintiffs again failed to demonstrate irreparable harm. [ECF No. 54].

In response to Defendants' request for leave to move to dismiss [ECF Nos. 58, 59], Plaintiffs sought [ECF No. 67] and were granted leave to file the Second Amended Complaint.[5] The Order granting leave to amend admonished that by reason of the briefing on Plaintiffs' motion for a preliminary injunction and Defendants' pre-motion letters, Plaintiffs were on notice of the claimed deficiencies in the pleading and warned Plaintiffs that the Court would be reluctant to grant further leave to amend if Defendants successfully moved to dismiss the Second Amended Complaint.  [ECF No. 69].

Plaintiffs subsequently filed their Second Amended Complaint, which asserted eleven causes of action for both direct and derivative claims: (1) a derivative claim, on behalf of PIPINGusa, against Thalacker, Graybeal and Theetge for Breach of Fiduciary Duty and Diversion of Corporate Opportunity (SAC ¶¶ 69–74); (2) a direct claim, on behalf of the Hodnetts, against Thalacker, Graybeal and Theetge for Breach of Fiduciary Duty (SAC ¶¶ 75–81); (3) a derivative claim, on behalf of PIPINGusa, against the Krah Defendants (Thalacker, Graybeal, Theetge, and Krah USA) for Tortious Interference with Contract (SAC ¶¶ 82–85); (4) a derivative claim, on behalf of PIPINGusa, against the Krah Defendants for Tortious Interference with a Prospective Economic Advantage / Contractual Relationship (SAC ¶¶ 86–90); (5) a derivative claim, on behalf of PIPINGusa, against the Krah Defendants for Misappropriation of Trade Secrets under federal and New York law (SAC ¶¶ 91–96); (6) a derivative claim, on behalf of PIPINGusa, against Medalist Fund for Breach of Contract (SAC ¶¶

---

[5] During briefing of the Motion for a Preliminary Injunction, the Court had granted Plaintiffs leave to file a First Amended Complaint [ECF No. 36], which they did.  [ECF No. 37].

97–103); (7) a direct claim, on behalf of Brad Hodnett, against Medalist Fund for Breach of

Contract (SAC ¶¶ 104–109); (8) a derivative claim, on behalf of PIPINGusa, against Medalist

Fund for Breach of Oral Agreement (SAC ¶¶ 110–114); (9) a derivative claim, on behalf of

PIPINGusa, against the Medalist Defendants for Aiding and Abetting Breach of Fiduciary Duty

(SAC ¶¶ 115–119); (10) a direct claim, on behalf of the Hodnetts, against the Medalist

Defendants for Aiding and Abetting Breach of Fiduciary Duty (SAC ¶¶ 120–124); and (11) a

derivative claim, on behalf of PIPINGusa, against Medalist Fund and Medalist Partners for

Misappropriation of Trade Secrets under federal and New York law (SAC ¶¶ 125–131).

All Defendants now jointly move to dismiss Plaintiffs' Second Amended Complaint.

[ECF No. 71].  In support of their motion, Defendants filed a memorandum of law (Def. Br.

[ECF No. 72]).  In opposition to Defendants' motion, Plaintiffs filed a memorandum of law (Pl.

Opp'n [ECF No. 73]).  Defendants filed a reply.  (Def. Reply [ECF No. 77]).

## LEGAL STANDARDS

### A. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (alterations, internal quotation marks, and citations omitted).

When determining the sufficiency of a plaintiff's claim for Rule 12(b)(6) purposes, the Court must limit its consideration to the factual allegations in the complaint, "which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). For documents to be incorporated by reference, the complaint must make "a clear, definite and substantial reference to the documents." *Jones-Cruz v. Rivera*, No. 19 CIV. 6910 (PGG), 2021 WL 965036, at *3 (S.D.N.Y. Mar. 14, 2021) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).

## B. Derivative Claims

Defendants move this Court to dismiss under Federal Rule of Civil Procedure 12(b)(6) for non-compliance with Federal Rule of Civil Procedure 23.1. (Def Br. 9). Rule 23.1 of the Federal Rules of Civil Procedure requires a shareholder suing derivatively to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." To excuse the requirement for pre-suit demand, "the complaint must plead with particularity facts showing that a demand on the board would have been futile." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).[6]

---

[6] The parties agree that Delaware law controls the substantive question of whether demand is excused since PIPINGusa, LLC was formed as a Delaware LLP. (Def. Br. 9; Pl. Opp'n 12); *see Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief.").

Futility can be satisfied where an LLC member is also a defendant because "it is substantially likely that Plaintiff's claims would subject [the LLC member] to liability and thus disable it from considering [a] demand." *Inter-Mktg. Grp. USA, Inc. on Behalf of Plains All Am. Pipeline, L.P. v. Armstrong*, No. CV 2017-0030-TMR, 2020 WL 756965, at *10 (Del. Ch. Jan. 31, 2020); *United Food & Commercial Workers Union v. Zuckerberg*, No. CV 2018-0671-JTL, 2020 WL 6266162, at *21 (Del. Ch. Oct. 26, 2020) ("[D]emand is futile if the complaint's allegations establish a reason to doubt whether [a majority of] directors could exercise disinterested and independent judgment regarding a demand.").

## **DISCUSSION**

### I.   **Plaintiffs Have Standing To Assert Derivative Claims On Behalf Of PIPINGusa**

Defendants first argue that Plaintiffs lack standing to assert any of their derivative claims on behalf of PIPINGusa because the Hodnetts, they contend, control the company and could have brought the claims directly on the company's behalf. (Def Br. 9). Specifically, they rely on the PIPINGusa certificate of formation to assert that the Hodnetts are the sole members of PIPINGusa and therefore have the sole power and authority to cause PIPINGusa directly to bring the alleged causes of action. (Def Br. 9).

Accepting Plaintiffs' allegations as true, Thalacker and Graybeal own a 50% interest in PIPINGusa, and Theetge and Graybeal are both members of PIPINGusa. (*See* SAC ¶¶ 12, 14, 24, 68). For this reason, Plaintiffs sufficiently allege that demand would be futile. (SAC ¶ 68); *see also Barry v. Curtin*, 993 F.Supp.2d 347, 352–53 (E.D.N.Y. 2014) ("[A] shareholder derivative action is an appropriate method for one fifty percent shareholder to obtain relief in the name of the corporation against the other fifty-percent shareholder.") (citations omitted)).

11

Defendants' reliance on the formation certificate in arguing that the Hodnetts were the only members of the LLC is misplaced.  Under Delaware law, in the absence of an operating agreement, an individual can become a member of an LLC "upon the consent of all [current] members."  *See* 6 Del. Stat. § 18-301(b)(1).  In fact, the formation documents on which Defendants rely states that the Hodnetts were merely the "*initial* members of the Limited Liability Company until their successors are elected and qualify."  (*See* Hodnett Decl., Ex. 39 [ECF No. 22–39] ("certificate of formation") (emphasis added)).  As pleaded in the SAC, "Graybeal and Theetge agreed to be members of PIPINGusa and make an associated capital contribution to the company both prior to the formation of the LLC and afterwards."  (SAC ¶ 44).  Accordingly, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the SAC sufficiently alleges that pre-suit demand would be futile. Plaintiffs therefore can adequately plead pre-suit futility with respect to the derivative claims.

## II.   Plaintiffs' Sufficiently Plead Breach Of Fiduciary Duty Claims Against Thalacker, Graybeal, And Theetge

The Krah Defendants first challenge the sufficiency of Plaintiffs' claims for breach of fiduciary duty.  Plaintiffs allege that Thalacker, Graybeal, and Theetge breached their fiduciary duties to PIPINGusa, and in the alternative to the Hodnetts, when they founded a company to compete with PIPINGusa and diverted a valuable corporate opportunity, *i.e.*, the KHB supply agreement and the Medalist Defendants funding agreement, from PIPINGusa to their newly founded company, Krah USA.  (SAC ¶ 71).

### A.   Plaintiffs May Alternatively Assert A Derivative Claim And Direct Claim For Breach Of Fiduciary Duty

As a preliminary matter, Defendants contend that all of Plaintiffs' breach of fiduciary duty causes of action should be dismissed on the grounds that asserting both direct and derivative

claims creates an impermissible conflict of interest.  (Def. Br. 11).  Rule 23.1 of the Federal

Rules of Civil Procedure provides that a "derivative action may not be maintained if it appears

that the plaintiff does not fairly and adequately represent the interests of shareholders or

members who are similarly situated in enforcing the right of the corporation or association."

"Although the Second Circuit has not held that there is a *per se* rule against bringing derivative

and direct claims simultaneously, . . . courts in this District have applied a strict standard in

scrutinizing direct and derivative actions for signs of conflict . . . ."  *Tatintsian v. Vorotyntsev*,

No. 16cv7203 (GHW), 2018 WL 2324998, at *2 (S.D.N.Y. May 22, 2018) (internal quotation

marks and citations omitted).  Although courts have found conflicts where "[s]ubstantial

recovery on the [direct] claim may reduce the potential recovery on behalf of the corporation on

the derivative claim," *Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 108–09 (S.D.N.Y. 1990),

in cases such as this one where plaintiffs and defendants are the only owners of a closely-held

entity, courts have found that no such conflict exists.  *See Tatintsian*, 2018 WL 2324998, at *3

("Direct and derivative claims have also been allowed to move forward simultaneously where

the plaintiffs and the defendants were the only shareholders of the company, such that recovery

on either the direct or the derivative claim would inure to the benefit of the same individuals.");

*Grgurev v. Licul*, 229 F. Supp. 3d 267, 296 (S.D.N.Y. 2017) (denying motion to dismiss direct

breach of fiduciary duty claim where derivative claims are brought on behalf of closely held

corporation whose co-owners are the only parties in the litigation, noting that "[i]t is difficult to

discern how Plaintiffs could not fairly represent themselves").  Here, the parties to this suit are

the only alleged owners of PIPINGusa.  (*See* SAC ¶¶ 24–26, 44).  Accordingly, at the pleading

stage, the fact that Plaintiffs bring both direct and derivative claims simultaneously is not a basis
for dismissal.

      B.  *The Derivative Breach Of Fiduciary Duty Claims*

          1.  **Delaware Law Applies To Plaintiffs'**
               **Derivative Breach Of Fiduciary Duty Claims**

As a preliminary matter, the parties dispute which states' laws govern Plaintiffs'
derivative breach of fiduciary duty claim.  Plaintiffs contend that New York, as the center of
gravity for the events alleged, has the greatest interest in the outcome of this case and therefore
its law governs.  (Pl. Opp'n 21).  Defendants contend that Delaware law, as the state of
incorporation, governs the breach of fiduciary duty claim.  (Def. Br. 7).

Generally, where, as here, a federal court is adjudicating state law claims that are pendent
to a federal claim, the Court must apply the choice-of-law rules of the forum state.  *Rogers v.
Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).  New York applies the internal affairs doctrine to
claims for breach of fiduciary duty owed to a corporation and, thus, applies the law of the state of
incorporation to such claims.  *See Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796, 798 n.3
(2d Cir. 1980) ("New York law dictates that the law of the state of incorporation governs an
allegation of breach of fiduciary duty owed to a corporation."); *see also Cartwright v. D'Alleva*,
782 F. App'x 77, 78 (2d Cir. 2019) ("In New York, the laws of the state of incorporation govern
a claim of a breach of fiduciary duty."); M*atsumura v. Benihana Nat. Corp.*, 465 F. App'x 23, 29
(2d Cir. 2012) ("Haru is incorporated in Delaware.  Accordingly, under New York choice of law
rules, Delaware law applies to the claim for breach of fiduciary duty.").  Accordingly, since
PIPINGusa is incorporated in Delaware (SAC ¶¶ 11, 44), Delaware law applies to Plaintiffs'
derivative claim for breach of fiduciary duty to PIPINGusa.

### 2.  Plaintiffs Sufficiently Plead A Derivative Breach Of Fiduciary Duty Claim

Under Delaware law, to state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship and (2) misconduct by the defendant.  *See York Lingings v. Roach*, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999).

#### a.  The SAC Sufficiently Alleges That Thalacker, Graybeal, and Theetge Owed Fiduciary Duties To PIPINGusa

Under Delaware law, the scope of the fiduciary duties owed by members or managers of an LLC is "primarily . . . governed by the [LLC] agreement."  *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 464 (Bankr. D. Del. 2018).  In the absence of an LLC agreement or where the LLC agreement is silent, the Delaware Chancery Court consistently has found a default rule that a manager or director of the LLC owes fiduciary duties to fellow LLC members and to the LLC.  *See, e.g.*, *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("[T]he Delaware Limited Liability Company Act . . . contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC."); *Kelly v. Blum*, No. CIV.A. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("[I]n the absence of a contrary provision in the LLC agreement, LLC managers and members owe traditional fiduciary duties of loyalty and care to each other and to the company." (internal quotation marks and citations omitted)).  However, Delaware law imposes no default fiduciary duties on "passive members." *See, e.g.*, *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) ("[W]hile managers and managing members owe default fiduciary duties, passive members do not, absent a modification of the LLC agreement or facts suggesting that the purportedly passive member was acting in a managerial capacity." (internal quotation marks and citations omitted)); *Feeley*, 62 A.3d at 662 (holding that LLC members who are passive investors

do not owe default fiduciary duties); *Imbert v. LCM Int. Holding LLC*, No. CIV.A. 7845-ML, 2013 WL 1934563, at *7 (Del. Ch. May 7, 2013) ("Delaware law imposes no default fiduciary duties on non-managing, non-controlling members of limited liability companies."); *Kuroda v. SPJS Holdings, L.L.C.*, No. CIV.A. 4030-CC, 2010 WL 925853, at *7 n.28 (Del. Ch. Mar. 16, 2010) ("Tellingly, defendants have not provided a single citation or reference to a Delaware statute or case that imposes fiduciary duties on non-managing or non-controlling members of an LLC.").

Defendants again contend that, according to the formation documents, Thalacker, Graybeal, and Theetge were never members of PIPINGusa.  (Def. Br. 13).  In the alternative, Defendants contend that the SAC does not allege that Thalacker, Graybeal, and Theetge were managers or directors of PIPINGusa.  (Def. Br. 14).  They contend that, according to the SAC, Cynthia Hodnett agreed to be the sole managing member of the LLC.  (Def. Reply 8; SAC ¶ 24).

However, as discussed above, the SAC sufficiently pleads that Thalacker, Graybeal, and Theetge *were* members of PIPINGusa.  *See supra*, Part 1.  In addition, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the SAC sufficiently alleges facts from which to draw the inference that Thalacker, Graybeal, and Theetge were managers or directors of PIPINGusa.  The SAC alleges that Thalacker and Graybeal jointly controlled a 50% interest in the LLC (SAC ¶ 24), that Thalacker and Graybeal agreed to "jointly control the company" with the Hodnetts (SAC ¶ 26), that Graybeal specifically agreed to serve as an officer in the LLC (SAC ¶ 24), and that Theetge was given a non-voting membership in PIPINGusa and installed as its president (SAC ¶ 25).

Moreover, Plaintiffs have pleaded facts showing that Thalacker, Graybeal, and Theetge were intimately involved in the management and direction of the LLC and rose well above the

level of "passive investors." *See Feeley*, 62 A.3d at 662.  The SAC alleges that Thalacker,

Graybeal, and Theetge agreed to be primarily responsible for operations, including building the

business' manufacturing plant, engineering, and the technical side of the venture (SAC ¶ 26),

that Thalacker agreed to take the lead in negotiating a lease for a PIPINGusa manufacturing site

with the City of Prineville (SAC ¶ 26), and that Thalacker and Graybeal were substantially

involved in the development of the company's business plan and *pro forma* financial projections

(SAC ¶ 28).  Plaintiffs also allege that Theetge, then acting as President of PIPINGusa, executed

the supply agreement with KHB on behalf of PIPINGusa.  (SAC ¶ 49).  Accordingly, looking to

the totality of the allegations in the SAC, Plaintiffs have sufficiently pleaded facts to support a

reasonable inference that Thalacker, Graybeal, and Theetge owed fiduciary duties to PIPINGusa

and to the Hodnetts.

### b.   The SAC Sufficiently Pleads That Defendants Diverted Corporate Opportunities From PIPINGusa

Defendants next argue that even if Thalacker, Graybeal, and Theetge owed PIPINGusa a

fiduciary duty, the SAC fails to allege a cognizable claim based on the corporate opportunity

doctrine.  (Def. Br. 14).  In particular, Defendants contend that once Thalacker, Graybeal, and

Theetge broke off their relationship with PIPINGusa, PIPINGusa no longer had the technical

expertise or ability to exploit the supply agreement with KHB.  (Def. Br. 14–15).  As a result,

they argue, they could not have diverted a corporate opportunity that PIPINGusa was unable to

exploit.  (Def. Br. 14–15).

The doctrine of "corporate opportunity" precludes a corporate fiduciary from acquiring

for himself a business opportunity that his corporation is financially able to undertake, which

falls into the line of the corporation's business and is of practical advantage to it, or is an

opportunity in which the corporation has an actual or expectant interest. *Equity Corp. v. Milton*,

221 A.2d 494, 497 (Del. 1966); *see also Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996).  Here, the SAC alleges that, prior to the departure of Thalacker, Graybeal, and Theetge, PIPINGusa was on the verge of securing the necessary funding to pursue an exclusive supply agreement with KHB (SAC ¶¶ 48–49), that this opportunity was in line with the LLC's business of manufacturing HDPE/PP pipes (SAC ¶¶ 13, 22, 59), and that PIPINGusa had an interest or expectancy in these opportunities, given that they executed the KHB supply agreement, had received a commitment from the Medalist Defendants to fund the business, and were in the final stages of negotiating the Prineville lease (SAC ¶¶ 48–49).  Accepting these allegations as true, the SAC sufficiently alleges that Thalacker, Graybeal, and Theetge appropriated for themselves a corporate opportunity that belonged to PIPINGusa.

Defendants' argument that PIPINGusa did not have sufficient personnel to take advantage of this opportunity amounts to an attempt to add a new requirement for diversion of corporate opportunities under Delaware law.  Significantly, Defendants cite to no Delaware legal authority in support of this argument.  (Def. Br. 14–16).  Moreover, Defendants' reasoning is circular.  A fiduciary cannot loot a company of its assets and resources and then claim that the company is no longer in a position to take advantage of those opportunities, thereby making the looting permissible.  Accordingly, Defendants' motion to dismiss Plaintiffs' derivative breach of fiduciary duty claim is denied.

C. *The SAC Sufficiently Pleads, In The Alternative, That*
   *Defendants Breached Their Fiduciary Duty To The Hodnetts*

Defendants also challenge the sufficiency of Plaintiffs' allegations with respect to their

alternative direct claim that Thalacker, Theetge and Graybeal breached the fiduciary duty that

they owed to the Hodnetts as members of a joint venture.

In order to establish the existence of a joint venture under New York law, a party must

plead that (1) two or more persons entered into an agreement to carry on an enterprise for profit;

(2) their agreement evinced an intent to be joint venturers; (3) each person contributed property,

financing, skill, knowledge, or effort; (4) each person had some degree of joint control over the

venture; and (5) there was a provision for the sharing of both profits and losses.  *Dinaco, Inc. v.*

*Time Warner, Inc.*, 346 F.3d 64, 67–68 (2d Cir. 2003).[7]  "An agreement to enter into a joint

venture may be oral and may be inferred from the totality of the parties' conduct in performance

of the joint venture."  *Calcagno v. Graziano*, 200 A.D.3d 1248, 160 N.Y.S.3d 135, 141 (3d Dep't

2021).  A joint venture can be found to exist even where the parties merely reach a basic

agreement with an "intent to hammer out details subsequently."  *Richbell Info. Servs., Inc. v.*

*Jupiter Partners, L.P.*, 309 A.D.2d 288, 298, 765 N.Y.S.2d 575 (1st Dep't 2003).

The SAC alleges sufficient facts to support Plaintiffs' alternative direct claim.  The SAC

alleges that the Hodnetts, Theetge, Graybeal, and Thalacker all agreed to be part of a joint

venture to create a company that would manufacture HDPE/PP pipes for sale and distribution

throughout the western United States.  (SAC ¶¶ 13, 22, 59).  All the parties attended meetings

---

[7] A federal court exercising its supplemental jurisdiction over state law claims applies the choice of law rules of the forum state.  *Rogers*, 875 F.2d at 1002.  With respect to Plaintiffs' direct breach of fiduciary duty claim, both parties' briefing assumes that New York law applies to this action.  (Def. Br. 16; Pl. Opp'n 29).  Accordingly, the Court applies New York law to Plaintiffs' direct breach of fiduciary duty claim.  *See Clarex Ltd. v. Natixis Sec. Am. LLC*, 2013 WL 2631043, at *2 (S.D.N.Y. June 11, 2013) ("Where the parties' briefs assume that New York law controls . . . such implied consent . . . is sufficient to establish choice of law.") (internal quotation marks omitted).

with outside parties on behalf of PIPINGusa (SAC ¶¶ 34, 46, 49, 77), Theetge, acting as

President of PIPINGusa, executed its contract with KHB (SAC ¶ 49), and Thalacker negotiated a

lease with the City of Prineville on behalf of PIPINGusa (SAC ¶¶ 26, 41).  The parties all agreed

to contribute their financial resources, effort, and skill to PIPINGusa by working on the business

plan, *pro forma* projections, contracts, and negotiations, all on behalf of the venture.  (SAC

¶¶ 26, 28, 43, 45, 77, 26).  They also agreed to joint control and a division of profits and losses.

(SAC ¶¶ 25–26, 77).  Accordingly, Defendants' motion to dismiss this alternative claim is

denied.

*      *      *

Taken together and accepting all well-pleaded allegations as true, Plaintiffs' have

sufficiently pled that Theetge, Graybeal, and Thalacker owed fiduciary duties to PIPINGusa and

to the Hodnetts and that they breached those duties when they diverted corporate opportunities

for their own benefit at the expense of those to whom they owed a duty of loyalty.  Accordingly,

Defendants' Motion to Dismiss Plaintiffs' claims for breach of fiduciary duty, pleaded

alternatively as direct and derivative claims, is denied.

Defendants also move to dismiss Plaintiffs' claims against Medalist for aiding and

abetting the Krah Defendants' breach of fiduciary duty on the sole ground that there was no

underlying breach of fiduciary duty.  (Def. Br. 27).  The Motion to Dismiss on that ground is

therefore also denied.

### III.    Plaintiffs Sufficiently Plead A Breach Of Contract Claim Against Medalist Fund

The SAC alleges a breach of contract claim against Medalist Fund, asserting that

Medalist Fund breached the Confidentiality Agreement in two respects.  First, Plaintiffs contend

that Medalist Fund breached the Confidentiality Agreement by misusing in its decision to fund

20

Krah USA confidential information that Plaintiffs had shared with Medalist Fund in confidence. (SAC ¶ 101).  Second, Plaintiffs allege that Medalist Fund breached the non-circumvention provision of the Confidentiality Agreement when it used confidential information disclosed by PIPINGusa to pursue the investment transaction without PIPINGusa.  (SAC ¶ 102).

> ### A.   Use Of PIPINGusa's Confidential Information

The SAC sufficiently alleges a breach of contract claim based on allegations that Medalist Fund breached the nondisclosure provision of the Confidentiality Agreement.  That provision prohibited Medalist Fund from making an "investment decision[] on the basis of any Confidential Information, other than with respect to the Potential Transaction itself." (Confidentiality Agreement ¶ 3(c)).  Plaintiffs allege that, over the course of nearly two months, PIPINGusa provided Medalist Fund with detailed information regarding PIPINGusa's business plan, its research and knowledge regarding HDPE/PP piping technology, the market for this technology, the terms of PIPINGusa's contract with KHB, and PIPINGusa's proposed lease with the City of Prineville for a manufacturing site.  (*See* SAC ¶¶ 33–35, 47, 100).  They allege that, based on this information, Medalist Fund determined that it wanted to invest in PIPINGusa. (SAC ¶¶ 36, 48–49).  The SAC alleges that five days after the agreement with Medalist Fund fell through, Medalist Fund signed a loan agreement with Krah USA that was identical to the one it had been about to enter with PIPINGusa.  (SAC ¶¶ 50, 54).  Accordingly, Plaintiffs allege that Medalist Fund made the decision to invest in Krah USA on the basis of business plans, financial models, and other confidential information provided to it by PIPINGusa under the protection of the Confidentiality Agreement.  (SAC ¶ 101).

Medalist Fund first contends that none of the information that Plaintiffs provided to Medalist Fund was confidential.  Specifically, Medalist Fund claims that PIPINGusa's contract

with KHB, its planned lease with the City of Prineville, and its business plan were not "confidential information" under the terms of the Confidential Agreement because that information belonged to third parties as well as PIPINGusa.  (Def. Br. 19; Def. Reply 12).  As an initial matter, at best, Medalist Fund improperly raises as a basis for a Motion to Dismiss a disputed issue of fact.  At this stage, the Court must accept as true Plaintiffs' allegation that this information was confidential.

Moreover, Medalist Fund's argument ignores the language of the Confidentiality Agreement itself, which, protected "all . . . confidential and proprietary information of [Medalist Fund] or [PIPINGusa] shared by [Medalist Fund] and [PIPINGusa] with each other, whether owned by [Medalist Fund], the Fund, [PIPINGusa] *or third parties*."  (Confidentiality Agreement ¶ 2 (emphasis added); SAC ¶ 32).  Further undercutting Medalist Fund's argument, the Confidentiality Agreement also specifies that confidential information included "without limitation, any and all written, oral or visual business or financial information (including . . . *business plans*), *current and planned business relationships*, marketing and sales plans and methods, lists, *contracts*, procedures, documents, analyses, reports, and any other information . . . owned, possessed or used by [Medalist Fund] and [PIPINGusa]."  (SAC ¶ 32; Confidentiality Agreement ¶ 2 (emphasis added)).  Medalist Fund's argument that PIPINGusa's business plan was developed by Thalacker prior to his relationship with PIPINGusa (Def. Br. 19) similarly ignores the allegations in the SAC that Thalacker agreed to contribute this business plan to PIPINGusa (SAC ¶ 23), and moreover, that after the parties agreed to form PIPINGusa, the business plan was further revised from Thalacker's initial draft (SAC ¶ 28).  These allegations support the reasonable inference that these business plans, at the time they were shared with Medalist Fund, belonged to PIPINGusa, not Thalacker individually.

Medalist Fund also claims that Plaintiffs fail to plead that Medalist Fund relied on PIPINGusa's information in making its decision to invest in Krah USA.  (Def. Br. 20).  Medalist Fund contends that the inference that Medalist Fund relied on this information to fund Krah USA is implausible compared to, what it alleges, is a more reasonable explanation: that Thalacker, Theetge, and Graybeal independently provided Medalist Fund with the information it needed to vet the Krah USA investment.  (Def. Br. 20).  But Plaintiffs need only plead sufficient facts, from which to draw the reasonable inference to support their own claim.  *See Iqbal*, 556 U.S. at 678.  Whether Medalist Fund *actually* relied on this information in making its decision is a fact question not appropriate for consideration at this stage.  Accepting Plaintiffs' allegations as true, as the Court must on a Motion to Dismiss, they plead sufficient facts to support a reasonable inference that Medalist Fund relied on PIPINGusa's information in making the investment decision with respect to Krah USA.  Specifically, the SAC alleges that Medalist Fund engaged in a due diligence review of PIPINGusa's business over the course of two months, during which PIPINGusa shared significant confidential information regarding PIPINGusa's business plan. (*See* SAC ¶¶ 33–35, 47, 100).  The SAC alleges that, despite this detailed and lengthy process, five days after the agreement with Medalist Fund fell through, Medalist Fund signed a loan agreement with Krah USA that was identical to the one it had been about to enter with PIPINGusa.  (SAC ¶¶ 50, 54).  Accordingly, Plaintiffs allege that Medalist Fund made the decision to invest in Krah USA on the basis of the confidential information it had been provided by PIPINGusa.  (SAC ¶ 101).  At this stage, accepting all of the SAC's allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs adequately plead that Medalist Fund breached the Confidentiality Agreement by using PIPINGusa's confidential information in its decision to invest in Krah USA.

23

B.  *Non-Circumvention Provision*

Medalist Fund also challenges whether Plaintiffs sufficiently allege that Medalist Fund breached the non-circumvention provision of the Confidentiality Agreement.  The parties offer differing interpretations of this contract language and Plaintiffs urge that the language is highly ambiguous.  (Pl. Opp'n 18).  To the extent the contract language arguably is ambiguous, Plaintiffs may be entitled to discovery for possible extrinsic evidence that might clarify the intentions of the parties with respect to this provision.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings.").  Regardless, on a motion to dismiss, the Court "should resolve any contractual ambiguities in favor of the plaintiff."  *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  At the pleading stage, the Court interprets the non-circumvention provision in the manner most favorable to Plaintiffs.

Proceeding to Medalist Fund's substantive arguments, Medalist Fund first argues that the Confidentiality Agreement could not have precluded Medalist Fund from communicating with Theetge and Graybeal, because each was a representative of PIPINGusa.  (Def. Br. 21).  It contends that to hold otherwise would lead to an implausible scenario where Medalist Fund would have been precluded from communicating with PIPINGusa's principals once the agreement was signed.  (Def. Br. 22).  But this argument misreads the contract, which allows Medalist Fund to communicate with PIPINGusa's principals, *but not with the purpose of interfering with the potential transaction*.  (*See* Confidentiality Agreement ¶ 9).  Indeed, this is the whole crux of Plaintiffs' breach of contract cause of action.

24

Medalist Fund also contends that it did not breach the non-circumvention provision of the Confidentiality Agreement because, it contends, PIPINGusa still could have moved forward with its own business without Medalist Fund.  (Def. Br. 23).  Elsewhere in their briefing, Defendants argue that once Thalacker, Graybeal, and Theetge broke off their relationship with PIPINGusa, PIPINGusa no longer had the technical expertise or ability to exploit the supply agreement with KHB.  (Def. Br. 14–15).  Regardless, Medalist Fund's argument ignores the language in the non-circumvention provision, which states that neither party can contact a party with the intent of interfering with the consummation of the potential transaction *specifically* between Medalist Fund and PIPINGusa.  (Confidentiality Agreement ¶ 9).  Clearly, PIPINGusa would not have been able to continue with this transaction once Medalist Fund broke it off.

Accepting all the well-pled allegations in the SAC as true, and drawing all reasonable inferences in Plaintiffs' favor, the SAC adequately pleads that Medalist Fund breached the terms of the Confidentiality Agreement when it used PIPINGusa's confidential information to consummate a transaction with Krah USA that, as Plaintiffs allege, was identical to the transaction it had agreed to consummate with PIPINGusa.

## IV.  The SAC Sufficiently Pleads A Breach Of An Oral Agreement Claim Against Medalist Fund

The SAC adequately alleges a claim for breach of oral agreement against Medalist Fund. The SAC alleges that, at a December 10, 2019 meeting, Medalist Fund (through Richter) promised to provide PIPINGusa with $15 million in financing so that PIPINGusa could fund its business and enter into the KHB exclusive supply agreement.  (SAC ¶¶ 49, 111).  Plaintiffs allege that, in reliance on that promise, PIPINGusa signed the supply agreement with KHB. (SAC ¶ 49).  The SAC also describes the terms of the alleged agreement, which Plaintiffs contend was memorialized in a Loan Agreement and Promissory Note circulated between

PIPINGusa and Medalist Fund in December 2019.  (SAC ¶ 112).  Plaintiffs allege that the terms

of this agreement include a $15 million revolving line of credit, that interest on each borrowing

under the Note shall accrue at a rate of 12% per annum, that all interest would be calculated on

the basis of actual days elapsed in a 365-day year, and that the termination date of the agreement

was November 30, 2023.  (SAC ¶ 112).  The SAC, thus, describes the terms of the parties'

agreement which are sufficiently "definite and explicit so their intention may be ascertained to a

reasonable degree of certainty," as required under New York law.  *See Foros Advisors LLC v.*

*Digital Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018).

Medalist Fund contends that the terms of this loan were never finalized between the

parties.  (Def. Br. 24–27).  Nonetheless, the SAC alleges that Richter, acting on behalf of

Medalist Fund, orally agreed to fund PIPINGusa and the exclusive supply agreement it signed

with KHB.  (SAC ¶¶ 49, 111).  To the extent that Medalist Fund wishes to contest the existence

or terms of that agreement, it will have the opportunity to do so with evidentiary proof on

summary judgment motion practice or at trial.  At this stage however, accepting the pleadings in

the SAC as true, Plaintiffs have sufficiently alleged a claim for breach of oral contract.

### V.   Plaintiffs Sufficiently Plead A Misappropriation Of Trade Secrets Claim Under Federal And New York Law

Plaintiffs allege a derivative claim, on behalf of PIPINGusa, against the Krah Defendants,

Medalist Fund, and Medalist Partners for Misappropriation of Trade Secrets under both federal

and New York State law.  To state a claim for misappropriation under the Defend Trade Secrets

Act, 18 U.S.C. § 1836(b)(1), (the "DTSA"), a plaintiff must allege that it possessed a trade secret

that the defendant misappropriated.  The elements for a misappropriation claim under New York

law are fundamentally the same.  *See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d

Cir. 1999).  Since "[t]he requirements are similar," courts have found that a "[c]omplaint

26

sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law." *ExpertConnect, LLC v. Fowler*, 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019).

### A.  Plaintiffs Allege The Existence Of Trade Secrets

Defendants first contend that the SAC fails to establish the existence of a protectable trade secret.  (Def. Br. 28–30).  In particular, they argue that Plaintiffs merely restate the elements of a trade secret, which is insufficient to survive a Rule 12(b)(6) motion.  (Def. Br. 29).

The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," so long as: (1) "the owner thereof has taken reasonable measures to keep such information secret"; and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  In determining whether information qualifies as a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation omitted).  "These factors are guideposts, not elements, and it is not necessary to

plead every single factor to state a claim." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015).

Here, Plaintiffs allege that PIPINGusa's business plan, financial projections and modeling, market research, list of identified customers, and the terms of the exclusive supply agreement it negotiated with KHB constitute protectable trade secrets. (SAC ¶¶ 92, 126). Plaintiffs allege that this information was extremely valuable to PIPINGusa, was the result of hundreds of hours of work, and that it could not be duplicated easily. (SAC ¶¶ 23, 61, 94). Plaintiffs further allege that PIPINGusa also took measures to safeguard this information, including by requiring individuals to which it provided the information to execute non-disclosure agreements. (SAC ¶¶ 30, 46, 94). PIPINGusa also made sure to mark these documents as "confidential property of PIPINGusa." (SAC ¶ 92). Accordingly, the SAC sufficiently pleads that PIPINGusa's confidential business plans, financial projections, the terms of the exclusive supply agreement that it negotiated with KHB, and other proprietary information are trade secrets under both the federal and New York standards. *See Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 381 (S.D.N.Y. 2020) (business documents constitute trade secrets where plaintiff took steps to keep confidential and "expended considerable resources, both financial and in personnel time" developing them); *Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40–41 (2d Cir. 2019) (plaintiff adequately pled that supplier lists, pricing and payment terms, and shipping information, among other items, were trade secrets).

### B. Plaintiffs Allege That Defendants Misappropriated Their Trade Secrets

Both the Krah Defendants and the Medalist Defendants argue that, even if the SAC sufficiently pleads the existence of trade secrets, it fails to plead sufficient facts from which to draw the reasonable inference that the Defendants misappropriated that information. To allege a

claim for misappropriation of trade secrets under the DTSA, the plaintiff must establish "an unconsented . . . use of a trade secret by one who . . . knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

With respect to the Krah Defendants, Plaintiffs allege that, over the course of about two months, Plaintiffs, together with Thalacker, Graybeal, and Theetge spent hundreds of hours developing a business plan, *pro forma* financial projections, and presentations, and reviewing, negotiating and/or drafting PIPINGusa's contract with KHB, the loan agreement with the Medalist Defendants, PIPINGusa's agreements, and the lease for the manufacturing facility with Prineville.  (SAC ¶¶ 13, 22, 59, 61).  Plaintiffs further allege that within days of the falling out between the Hodnetts and Thalacker, Graybeal, and Theetge, the later three formed a new company, signed an identical funding deal with the Medalist Defendants, and reached an identical exclusive supply agreement with KHB that PIPINGusa had entered into just days earlier.  (SAC ¶¶ 50–57).  Based on these factual allegations, Plaintiffs assert a claim that the Krah Defendants misappropriated the trade secrets of PIPINGusa in order to divert corporate opportunities to themselves.  (SAC ¶ 92).  Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the SAC sufficiently alleges that the Krah Defendants misappropriated PIPINGusa's trade secrets without PIPINGusa's consent.

The Medalist Defendants merely argue that the Court should dismiss Plaintiffs' Misappropriation of Trade Secrets claim against it for the same reasons that it contends the breach of contract and breach of fiduciary duty claims should be dismissed.  (Def. Br. 31).  As the above analysis reflects, the Court finds that Plaintiffs have sufficiently pled that the Medalist

Defendants breached the Confidentiality Agreement, *see supra*, Part III, and that the Krah

Defendants owed fiduciary duties to PIPINGusa and the Hodnetts, *see supra*, Part II.

Accepting all well-pled allegations as true and drawing all reasonable inferences in

Plaintiffs' favor, the SAC sufficiently pleads facts from which to support a reasonable inference

that PIPINGusa owned trade secrets, that it disclosed those trade secrets to Defendants, and that

the Defendants misappropriated those trade secrets from PIPINGusa and the Hodnetts.

## VI.    The SAC Adequately Alleges A Tortious Interference With Contract Claim Against The Krah Defendants

To plead a claim for tortious interference with contract under New York law, Plaintiffs

must allege: (1) the existence of a valid contract between the plaintiff and a third party; (2) the

defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-

party's breach of the contract without justification; (4) actual breach of the contract; and (5)

damages resulting therefrom. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir.

2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370,

1375 (N.Y. 1996)).

Contrary to the argument by the Krah Defendants, the SAC adequately alleges that the

Krah Defendants tortiously interfered with PIPINGusa's contracts with the Medalist Defendants.

As discussed above, the SAC sufficiently alleges the existence and breach of both PIPINGusa's

Confidentiality Agreement with the Medalist Defendants and the oral agreement between

PIPINGusa and the Medalist Defendants. *See supra*, Parts III, IV.  The SAC also pleads that

"Defendants Thalacker, Graybeal, Theetge, and Krah USA . . . knew that Medalist Fund had

entered into the Confidentiality Agreement with PIPINGusa which prevented it from pursuing a

similar investment based on Confidential Information that it received from PIPINGusa" and that

the "principals of PIPINGusa continued to rely on the expectation of confidentiality when

providing this information." (SAC ¶¶ 84, 47, 33). Plaintiffs allege that, Thalacker, Graybeal and Theetge set up a competing company, Krah USA, which entered into a financing agreement with the Medalist Defendants that was identical to the agreement PIPINGusa had previously entered into with the Medalist Defendants just two days earlier. (SAC 53–54, 56–57, 60, 85). Drawing all reasonable inferences from these allegations in favor of Plaintiffs, they have sufficiently pled a claim against the Krah Defendants for tortious interference with contract.

## VII.   The SAC Adequately Alleges A Tortious Interference With Prospective Business Relationship Claim Against The Krah Defendants

The Krah Defendants also challenge the sufficiency of Plaintiffs' alternative claim for tortious interference with prospective economic advantage/contractual relationship. (Def. Br. 33). To state a claim under New York law for tortious interference with business relations, a plaintiff must plead four elements: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

Here, the SAC alleges that PIPINGusa has a business relationship with the Medalist Defendants (SAC ¶¶ 30, 36, 49, 98), that the Krah Defendants knew of that relationship and intentionally interfered with it by setting up Krah USA and causing the Medalist Defendants to abandon their previous agreement to provide PIPINGusa with financing (SAC ¶¶ 53–54, 56–57, 60, 85), that the Krah Defendants used dishonest, unfair and improper means in doing so, by misappropriating PIPINGusa's trade secrets and by breaching the fiduciary duty that they owed to PIPINGusa, *see supra*, Parts II, V, and that the Krah Defendants' interference caused the relationship between PIPINGusa and the Medalist Defendants to break down (SAC ¶¶ 88–90). Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs'

favor, the SAC sufficiently pleads facts to support a claim that the Krah Defendants tortiously interfered with a prospective contractual relationship.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss [ECF No. 71] is DENIED.

The Clerk of Court is respectfully requested to terminate docket entry 71.


**SO ORDERED.**

**Date:   September 2, 2022**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**