UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRAD HODNETT and CYNTHIA HODNETT,<br><br>Plaintiffs,<br><br>-against-<br><br>MEDALIST PARTNERS OPPORTUNITY MASTER FUND II-A, L.P., MEDALIST PARTNERS, L.P., GREGORY PETER RICHTER, MARC THALACKER, MARK THEETGE, MARY L. GRAYBEAL, and KRAH USA LLC,<br><br>Defendants. | Case No. 1:21-cv-00038 (JLR)<br><br><u>**OPINION AND ORDER**</u> |

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs Brad Hodnett ("Brad") and Cynthia Hodnett ("Cynthia") (together, "Plaintiffs" or the "Hodnetts"), Defendants Medalist Partners Opportunity Master Fund II-A, L.P. ("Medalist Fund"), Medalist Partners, L.P. ("Medalist Partners"), Gregory Peter Richter (collectively with Medalist Fund and Medalist Partners, the "Medalist Defendants"), and Marc Thalacker, Mark Theetge, Mary L. Graybeal, and Krah USA, LLC ("Krah USA," and collectively with Thalacker, Theetge, and Graybeal, the "Krah Defendants"), cross-move for summary judgment under Federal Rule of Civil Procedure ("Rule") 56.  Defendants have also filed a joint motion to exclude the testimony of Ronald Quintero, the damages expert retained by Plaintiffs, under Federal Rule of Evidence ("FRE") 702.

For the reasons set forth below, the Court DENIES Plaintiffs' motion for summary judgment, and DENIES in part and GRANTS in part the Krah Defendants' motion for summary judgment.  The Court GRANTS the Medalist Defendants' motion for summary judgment and Defendants' joint motion to exclude Quintero's expert testimony.

## BACKGROUND

The Court draws the following facts from the parties' submissions in support of their respective motions for summary judgment, including the parties' Local Rule 56.1 statements and responses, as well as Defendants' joint *Daubert* motion.  *See* Dkt. 196 ("Krah Br."); Dkt. 197 ("Krah SUF"); Dkt. 202 ("Medalist Br."); Dkt. 203 ("Medalist SUF"); Dkt. 209 ("Daubert Br."); Dkt. 212 ("Pl. SUF"); Dkt. 214 ("JSUF"); Dkt. 216 ("Pl. Br."); Dkt. 217 ("Medalist RSUF"); Dkt. 218 ("Medalist Opp."); Dkt. 220 ("Krah Opp."); Dkt. 221 ("Krah RSUF");[1] Dkt. 227 ("Daubert Opp."); Dkt. 230 ("Pl. RSUF"); Dkt. 231 ("Pl. RSUF II"); Dkt. 232 ("Pl. Opp."); Dkt. 237 ("Krah Reply"); Dkt. 238 ("Medalist Reply"); Dkt. 239 ("Daubert Reply"); Dkt. 240 ("Pl. Reply"); Dkt. 241 ("Pl. RSUF III").  The Court also draws the following facts from the declarations of Dana M. Susman, Marc Thalacker, Jennifer Fiorica Delgado, Gregory P. Richter, James Regan, Travis J. Mock, and Daniel F. Gilpin, and the exhibits attached thereto.  *See* Dkt. 44 ("Theetge Decl."); Dkt. 45 ("Thalacker Decl."); Dkt. 47 ("Richter Decl.") Dkt. 194 ("Susman Decl."); Dkt. 195 ("Thalacker Decl. II"); Dkt. 199 ("Delgado Decl."); Dkt. 200 ("Richter Decl. II"); Dkt. 201 ("Regan Decl."); Dkt. 206 ("Delgado Decl. II"); Dkt. 207 ("Richter Decl. III"); Dkt. 208 ("Regan Decl. II") Dkt. 213 ("Mock Decl."); Dkt. 215 ("Gilpin Decl."); Dkt. 219 ("Delgado Decl. III."); Dkt. 228 ("Mock Decl. II"); Dkt. 229 ("Mock Decl. III"); Dkt. 235 ("Mock Decl. IV").

## I.    Defendants' Evidentiary Objections

As an initial matter, Defendants raise several evidentiary objections to Plaintiffs' Local Rule 56.1 statement, arguing that many of Plaintiffs' facts contained within Plaintiffs'

---

[1] Since the Krah Defendants and the Medalist Defendants jointly filed Responses and Objections to Plaintiffs' Statement of Undisputed Fact, Dkts. 217 and 221 are identical.  The Court shall refer therefore to Dkt. 217 and Dkt. 221 collectively as "Df. RSUF."

Local Rule 56.1 statement are immaterial and inadmissible, including because they contain "numerous instances of inadmissible hearsay and assertions not supported by evidence or testimony." Df. RSUF at 1. Defendants also argue that the Mock Declaration "was not filed contemporaneously" with Plaintiffs' Local Rule 56.1 statement, and that therefore "each statement relying upon exhibits purportedly attached to the Mock Decl. are insufficiently supported and not based on personal knowledge." *Id.* at 1-2. The Krah Defendants separately argue that Plaintiffs' Local Rule 56.1 response resorts to "improper qualifications," asserting "blanket denials, and/or injecting additional information in order to deflect and obfuscate," and that the Court should therefore disregard Plaintiffs' response in its entirety. Krah Reply at 10-11 (footnote omitted).

To the extent that Plaintiffs' statements are immaterial, the Court does not consider them. As for Defendants' assertion that many of the allegations asserted in Plaintiffs' Local Rule 56.1 statement are inadmissible, "[w]here, as here, a district court is making evidentiary determinations in deciding a motion for summary judgment, it is well established that the court 'has broad discretion in choosing whether to admit evidence.'" *SEC v. Cole*, No. 12-cv-08167 (RJS), 2015 WL 5737275, at * 4 (S.D.N.Y. Sept. 19, 2015) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 582 F.3d 244, 264 (2d Cir. 2009)). Moreover, a survey of Defendants' objections reveals that many are rote objections asserting Plaintiffs' supposed "fail[ure] to cite evidence in an admissible form," even though the evidence cited clearly falls within a hearsay exception (for instance, as a party-opponent admission), and otherwise supports Plaintiffs' statements. *See, e.g.*, Df. RSUF ¶¶ 3, 4, 11, 23, 29, 42, 44, 53. These rote objections do not specifically controvert the facts set forth in Plaintiffs' Local Rule 56.1 Statement with evidence. *See id.* "As such, to the extent [Plaintiffs'] statements are *only* disputed by reference to [these] 'general objections,' the Court will deem them undisputed."

*Cruz v. N.Y.C. Transit Auth.*, No. 23-cv-05272 (JLR), 2025 WL 551809, at *2 (S.D.N.Y. Feb. 19, 2025) (second alteration in original) (citation omitted); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) ("An objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue."); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Finally, to the extent that Defendants object to references to "PIPINGusa" because, prior to December 2, 2019, "no entity had been organized, formed, or incorporated under the name 'PIPINGusa,'" *see, e.g.*, Df. RSUF ¶¶ 62, 66, 76, 92, Defendants' own testimony establishes that the project name for the piping project was understood to be "PIPINGusa" (even if PIPINGusa was not a formal legal entity until later in time), *see, e.g.*, Dkt. 215-8 ("Theetge Dep.") at 120:7-17.  As for the Krah Defendants' separate objections to Plaintiffs' responses in their Rule 56.1 response, the Court will disregard those responses that "insert[] improper qualifications," "assert[] blanket denials," and/or "inject[] additional information in order to deflect and obfuscate."  Krah Reply at 10-11.  In the event the Court deems any cited evidence inadmissible, "this Court will exercise its broad discretion and 'simply ignore . . . those paragraphs lacking factual support or citing to inadmissible evidence.'"  *PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-cv-07577 (KMK), 2023 WL 2973038, at *3 (S.D.N.Y. Mar. 28, 2023) (quoting *Mayagüez S.A. v. Citibank, N.A.*, No. 16-cv-06788 (PGG) (JLC), 2022 WL 901627, at *8 (S.D.N.Y. Mar. 25, 2022)).

As for the Krah Defendants' request that the Court disregard any statements relying upon the Mock Declaration, or exhibits appended thereto, *see* Krah Opp. at 1 n.1, the Court declines to do so.  The Krah Defendants' request arises from a filing error in which Plaintiffs,

on October 4, 2024, and contemporaneously with the submission of their Local Rule 56.1

Statement, timely uploaded 85 exhibits to the docket as attachments to the Declaration of

Travis J. Mock but failed to file the declaration itself. The Krah Defendants contend that this

failure rendered Plaintiffs' Local Rule 56.1 Statement deficient under Rule 56. *See id*. On

October 28, 2024, however, Plaintiff uploaded to the docket the same 85 exhibits timely filed

on October 4, 2024, and this time included the previously "inadvertently omitted . . .

marshalling declaration." Pl. Reply at 1 n.1. The Krah Defendants have claimed no prejudice

from Plaintiffs' initial error or subsequent refiling. Therefore, the Court finds no basis for

disregarding all statements citing to the later-filed Mock Declaration, and indeed, doing so

would be contrary to courts' "preference to have issues and claims decided on the merits,

rather than on the basis of a procedural shortcoming." *Rodriguez v. Lunita's Café and Deli

Corp*, No. 21-cv-03909 (PGG) (HJR), 2025 WL 1002012, at *6 (S.D.N.Y. Mar. 31, 2025)

(quoting *Vista Food Exch., Inc. v. Com. de Alimentos Sanchez S de R L de C.V.*, 627 F. Supp.

3d 408, 417 (S.D.N.Y. 2022), *aff'd in part, vacated and remanded in part*, 147 F.4th 73, (2d

Cir. 2025)); *see also Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 465, 469

(S.D.N.Y. 2000) (accepting untimely Rule 56.1 statement where there was "no prejudice" to

plaintiff, and where defendants would be "seriously prejudiced" by preclusion).

Having disposed of the parties' evidentiary objections, the Court now turns to the

series of events that gave rise to this dispute.

## II.    Factual Background[2]

### A.    The Origins of the Business Opportunity

This dispute stems from a business idea, devised by Theetge and Thalacker several years ago, to modernize water irrigation systems in the Pacific Northwest, starting with the state of Oregon.  Theetge and Thalacker, both Oregon residents, have decades of experience in the irrigation industry.  JSUF ¶¶ 4, 5, 17.  Theetge has sold and distributed plastic piping for industrial use for over 30 years, including high-pressure, high-density polyethylene ("HDPE") piping.  JSUF ¶ 16; Dkt. 215-4 ¶ 2.  For his part, Thalacker has several decades of experience planning, implementing, and creating water irrigation systems throughout the state of Oregon, and has developed multidecade relationships with Oregon's water districts as a result.  JSUF ¶¶ 18, 34.  Sometime in 2018, Thalacker and Theege became interested in the prospect of modernizing irrigation systems in the Pacific Northwest using HDPE piping developed by Krah Pipe GmbH ("Krah GmbH" or "Krah Germany"), a German company.  JSUF ¶¶ 20, 35, 37; Df. RSUF ¶ 8.  Obtaining the right to use Krah Germany's HDPE piping technology was a "cornerstone" of Theetge and Thalacker's proposed piping venture.  Df. RSUF ¶ 9.  Krah GmbH's technology is "more environmentally friendly, more durable, and more efficient" than standard steel piping.  Pl. RSUF ¶ 18.  As luck would have it, Theetge had long-standing professional relationships with personnel at Krah Germany, including Alexander Krah, the company's President and Chief Executive Officer, and Bulent Kuzkaya, the company's Director of Business and Development.  JSUF ¶ 30.  In 2018, Theetge contacted Kuzkaya about selling Krah GmbH equipment in the Pacific Northwest.  JSUF ¶ 35.

---

[2] Unless otherwise noted, where only one party's Local Rule 56.1 Statement is cited, the other party either does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

Kuzkaya responded favorably, resulting in continued discussions between the pair regarding exclusive rights to purchase Krah Germany's technology in Oregon and producing HDPE piping using Krah GmbH technology.  JSUF ¶¶ 36-37.

From approximately mid-2018 through October 2019, Theetge, Thalacker, and Graybeal (Thalacker's business partner), with the help of third-party consultants Alan Horton and Julie O'Shea from the Farmer's Conservation Alliance ("FCA), worked together to form a comprehensive business plan that contemplated a private-public partnership to manufacture Krah Germany's proprietary technology in the Pacific Northwest (the "Business Plan"). JSUF ¶ 38; Theetge Decl. ¶ 5; Pl. RSUF ¶ 32; Pl. RSUF II ¶ 5.  The Business Plan identified the location of a manufacturing plant in Prineville, Oregon; produced a timeline for the development and launch of the project; and identified the investment necessary to develop a piping company in rural Oregon (approximately $16 million).  JSUF ¶¶ 39, 43-44.  With assistance from Horton and O'Shea, Theetge and Thalacker also prepared pro forma financial statements.  JSUF ¶¶ 38, 51; Df. RSUF ¶ 11.  However, efforts to secure funding for the venture with the FCA, and subsequently with the Deschutes Basin Board of Control ("DBBC"), fell through.  JSUF ¶¶ 46, 52; Df. RSUF ¶ 10.  Theetge, Thalacker, and Graybeal subsequently pivoted to contemplating the formation of their own piping business in the region.  JSUF ¶ 53; Theetge Decl. ¶ 6.  It is undisputed that the Hodnetts had no involvement in the creation or preparation of the original Business Plan, Pl. RSUF ¶ 40, and in fact did not see any version of the Plan before October 10, 2019, JSUF ¶¶ 66, 69.

### B.  Financing for the Business Opportunity

On June 21, 2019, Thalacker attended a charity event in memory of his younger brother to raise money for amyotrophic lateral sclerosis research.  JSUF ¶ 54.  Richter, a lifelong friend of Thalacker's younger brother, was also in attendance.  JSUF ¶ 55.  As

relevant here, Richter is also the Founder and Chief Executive Officer of Medalist Partners, a private investment management firm focused on credit opportunities. JSUF ¶ 10; Pl. RSUF ¶ 9. At the fundraiser, Thalacker and Richter generally discussed Theetge and Thalacker's plans to develop a piping company. Dkt. 215-7 ("Thalacker Dep.") at 93:14-23; Pl. RSUF II ¶ 3. The parties dispute the level of detail Thalacker went into during that conversation, including whether the parties discussed funding for the venture. *See, e.g.*, Pl. RSUF ¶¶ 61-62; Dkt. 215-6 ("Richter Dep.") at 43:4-13.

Several months later, in early October 2019, Thalacker attended an annual weekend retreat with high school friends where he saw Brad Hodnett, a friend of 45 years. JSUF ¶ 57; Df. RSUF ¶ 19. Thalacker mentioned the piping company at the retreat, including that the company was looking for funding, Thalacker Dep. at 109:18-24, and Brad expressed interest in the business idea. JSUF ¶¶ 58-59; *see also* Thalacker Decl. ¶ 13. But there was a condition: Brad was willing to work on the project only if he and his wife, Cynthia Hodnett, were "in control." Dkt. 194-4 ("Brad Hodnett Dep.") at 31:8-16; *see also id*. at 32:3-10. The Business Plan was circulated to Brad for the first time on October 10, 2019, JSUF ¶ 66, and only after he signed a nondisclosure agreement with the DBBC, *see generally* Dkt. 45-5. By that time, the Business Plan had already undergone several rounds of revisions. JSUF ¶ 70. The Hodnetts revised the project name to "PIPINGusa" and the documents reflect that they provided various comments and line edits to the Business Plan. *See generally* Dkt. 213-10 (emails conveying comments from the Hodnetts); *see also* Thalacker Dep. at 137:11-17; Df. RSUF ¶ 42. However, at their depositions, the Hodnetts could not recall any specific changes

they had made to the Business Plan, other than suggesting the name "PIPINGusa." Pl. RSUF ¶¶ 100-101.[3]

Brad promptly began to pursue funding for the company. On October 30, 2019, Brad texted Richter, writing: "Marc Thalacker asked me to reach out to you locally." Dkt. 22-10 at 1. That same day, Brad called Richter, Df. RSUF ¶ 47, and followed up with an email attaching the PIPINGusa business plan and pro forma financial statements, Dkt. 213-13; Df. RSUF ¶ 56. Prior to any further discussions, Richter required Brad to sign a Confidentiality Agreement (the "NDA") with Medalist Partners. Df. RSUF ¶ 57; Dkt. 213-16 (email from Richter to Brad with NDA); *see* Dkt. 213-17 at 4-8 (NDA). Brad did not sign the NDA in his individual capacity, JSUF ¶ 60, but edited the document to make "PIPINGusa" the counterparty to the Agreement. Dkt. 213-17 at 4 ("This Confidentiality Agreement . . . dated as of October 31, 2019, is between Medalist Partners Opportunity Master Fund II-A, L.P. ('MP') and PIPINGusa ('Recipient')"). Schedule A to the Confidentiality Agreement listed "PIPINGusa" as the subject entity in connection with a potential investment by Medalist Partners. Dkt. 213-17 at 4, 8. It is undisputed that at the time Brad sent the signed NDA to Richter, no legal entity had been organized, formed, or incorporated under the name "PIPINGusa." JSUF ¶ 61.

The Confidentiality Agreement contained nondisclosure, nonsolicitation, and noncircumvention provisions. *See* Dkt. 213-18 at 4-6. The Agreement's nondisclosure provision prohibited the parties from disclosing confidential information exchanged between the parties to any person, *id.* at 4, or from "mak[ing] any trading or investment decision on the

---

[3] As noted above, the Court proceeds with the understanding that the parties collectively referred to the piping project as "PIPINGusa" even though a legal entity under that name was not incorporated until December 2, 2019.

basis of any Confidential Information, other than with respect to the Potential Transaction itself," *id.* at 5.  The Agreement's nonsolicitation provision provided that the parties would not solicit the others' managing members, partners, or senior or key employees.  *Id.* at 6.  And the noncircumvention provision stated that neither party would "contact any party disclosed as Confidential Information to the receiving Party solely in respect of the Potential Transaction with the intent to prevent a Party from interfering with the other Party's efforts to (i) consummate the Potential Transaction or (ii) pursue the Potential Transaction without the involvement of the other Party."  *Id.*

The Hodnetts, Theetge, Thalacker, and Graybeal thereafter worked together toward obtaining funding and an exclusive relationship with Krah Germany for PIPINGusa.  Df. RSUF ¶ 29; *see also* Richter Dep. at 144:23-145:3; Thalacker Dep. at 136:3-137:4, 160:2-20, 164:16-165:18.  Over the next several weeks, the Krah Defendants shared information with Medalist, including the terms of a draft contract for exclusive rights to Krah Germany equipment, and updates on conversations with Kuzkaya.  *See* Dkt. 213-21; Dkt. 213-22.  Each of the parties played a role in the project.  As a general matter, Thalacker acted as the "link" or "middle person" between Theetge and Brad.  Thalacker Dep. at 313:12-23.  He also led the negotiations for the lease of PIPINGusa's manufacturing site in Oregon.  Df. RSUF ¶ 32.  Graybeal contributed operational knowledge and manpower, including assisting with putting proposals together and hiring the production team.  Df. RSUF ¶¶ 34-35.  Theetge negotiated an exclusive supply agreement with Krah Germany and selected the equipment to be purchased from Krah Germany for PIPINGusa's manufacturing facility.  Df. RSUF ¶ 43.  The Hodnetts retained the law firm Golenblock Eiseman Assor Bell & Peskoe LLP to advise the project, Df. RSUF ¶ 44; *see also* Thalacker Dep. at 281:5-282:9, and corresponded directly

with Medalist, Dkt. 213-13 at 1.  Theetge characterized Thalacker and Brad Hodnett as the ones "steering the boat."  Dkt. 213-14 at 1.

On November 14, 2019, Medalist, Thalacker, and the Hodnetts had a meeting at Medalist's offices regarding Medalist's potential investment in the piping business. JSUF ¶ 79.  Richter, Brian Herr, Medalist's Chief Investment Officer, Jim Regan, an asset manager at Medalist, and John Slonieski, Medalist's Director of Private Credit, also attended the meeting.  JSUF ¶ 83.  At the meeting, Thalacker discussed the business and engineering aspects of the company, including the Business Plan and pro forma financial statements, potential markets, and an analysis of strengths and weaknesses of the project.  Pl. RSUF ¶ 116.  Medalist set forth basic terms on which it would consider investing in the project: in exchange for an unsecured revolving credit facility of up to $15 million, to be repaid at a 12 percent interest rate, Medalist proposed acquiring a 75 percent interest and distribution preference until the company achieved a certain return on investment.  *See* JSUF ¶ 80; Richter Decl. ¶ 15.  Medalist expressly conditioned any funding on the execution of a final operating agreement for the entity through which the business would be operated.  JSUF ¶ 87; *see also* Pl. RSUF ¶ 123.

Medalist viewed Theetge as vital to PIPINGusa, including because of his strong relationship with Krah Germany.  JSUF ¶ 82.  "From Medalist's perspective, the key individuals for this new venture" were Thalacker, Theetge, and Graybeal, because "they were the ones who developed the business plan"; "they were the ones with the all-important relationship with Krah GmbH"; "they were the ones with the engineering knowledge crucial for the manufacture of the HDPE piping"; and "they were the ones with the relationships with potential customers."  Richter Decl. ¶ 11.  Richter therefore asked to speak directly with Theetge about PIPINGusa and how contracts were obtained.  Dkt. 213-25; *see also* Df.

RSUF ¶ 82.  Hodnett prepared a list of talking points for Theetge in advance of his meeting with Richter.  Dkt. 213-25.

On the Krah Germany side, Kuzkaya gave Theetge a November 29, 2019 deadline, extended until mid-December at Theetge's request, to provide Krah Germany with a signed purchase order and an initial deposit.  JSUF ¶¶ 89, 91-92.  If that deadline was missed, Krah Germany would not be able to deliver PIPINGusa's requested equipment until 2021.  JSUF ¶ 90.  Following discussions with Krah Germany, Theetge emailed Cynthia on November 16, 2019, copying Thalacker, Brad, and Graybeal, stating: "I have been communicating with Krah this morning. . . . Krah is focused on PIPEusa [*sic*] to be their horse for the West.  They are not entertaining any other interest in the West at this time."  Dkt. 213-26; Df. RSUF ¶ 86.

At the same time as discussions were ongoing with Krah Germany about exclusive distribution rights, the parties were also engaged in discussions about their respective roles and responsibilities in any future corporate entity.  On November 18, 2019, Brad circulated proposed answers to questions from Medalist to Thalacker, copying Cynthia, and asking for Thalacker's input regarding "roles and responsibilities for senior management."  Dkt. 213-2 at 2.  The draft email stated that "equity ownership will be split evenly amongst the founders: Brad Hodnett, Cindy Creagh Hodnett, and Midge Graybeal . . . ."  *Id.*  Cynthia circulated an updated document the next day, which clarified that equity ownership would be split fifty-fifty between the Hodnetts and Graybeal.  Dkt. 213-3 at 2.  Graybeal was designated as a "stand-in" for Thalacker to avoid the appearance of a conflict given his ongoing work with the Three Sisters Irrigation District.  Thalacker Dep. at 169:25-170:14.  A final version of the email was forwarded to Medalist later that day, retaining the representation that equity ownership would be split fifty-fifty between the Hodnetts and Graybeal.  Dkt. 213-4 at 2.  The email also set forth the parties' respective roles and responsibilities: Cynthia Hodnett was

designated "CEO/Managing Member"; Graybeal was designated responsible for "Engineering/Contract Bidding/Project Management/Architect"; Theetge was designated responsible for "Sales & Marketing"; Brad Hodnett was designated responsible for "Marketing, Public Relations & Technology"; and Thalacker was designated "Advisor/Plant Management Consultant." *Id.* Theetge wrote separately to Thalacker, stating: "seems to be a [*sic*] equity pc missing for me?" Dkt. 195-10 at 1. An internal Medalist screening memo for PIPINGusa circulated around the same time also represented that PIPINGusa's management consisted of the Hodnetts, Graybeal, and Theetge. *See* Dkt. 213-27 at 4. The screening memo further emphasized Thalacker's and Theetge's experience in the irrigation modernization and piping industries. *See id.* at 5-6.

Notwithstanding the parties' efforts to finalize an agreement, Richter informed Thalacker on November 26, 2019, that it would "not [be] possible to close this equity funding facility by December 2nd," given that there was still "no legal counterparty, no bank accounts, no operating agreement, etc." JSUF ¶ 98 (citation omitted). Richter reiterated, however, Medalist's "interest[t] in doing the deal," and stated that Medalist "simply require[d] verifiable documents to fund any type of investment." JSUF ¶ 98 (alteration adopted) (citation omitted). Medalist followed up with an indicative term sheet, and informed Brad Hodnett and Thalacker that if the management team achieved even 50 percent of the financial model, there would be "significant wealth creation for the PipingUSA management." Dkt. 213-28 at 2. The draft indicative term sheet listed PipingUSA's management as "consist[ing] of [Brad Hodnett, Cindy Hodnett, Midge Graybeal, and Mark Theetge]" and provided that any "[t]argeted addition[s]" to management — a reference to Thalacker — should be made by June 30, 2021. *Id.* at 4 (second set of brackets in original).

### C.  The Formation of PIPINGusa LLC

On December 2, 2019, the Hodnetts incorporated PIPINGusa LLC in Delaware and designated themselves as the only members of the company, with Cynthia Hodnett designated as the "managing member" of PIPINGusa LLC.  JSUF ¶¶ 100, 103-104.  The Krah Defendants maintain that the LLC was formed without their knowledge.  Thalacker Decl. ¶ 25; *see also* Pl. RSUF ¶ 142.  The Hodnetts also had sole access to PIPINGusa LLC's bank account, JSUF ¶ 105, and finalized other corporate formalities, including securing server storage and creating a web domain, *see* Mock Decl. IV ¶¶ 35-36; Dkt. 235-33 at 7-8 (securing cloud server storage); Dkt. 235-34 (payment statements for email domains).  At no time did PIPINGusa LLC file any supplemental corporate documents or amended formation documents, Pl. RSUF ¶¶ 144-145, and the Hodnetts never added Graybeal, Thalacker, or Theetge as members of the entity, Pl. RSUF ¶ 146.

Also on December 2, 2019, Theetge signed a Memorandum of Understanding ("MOU") between PIPINGusa and Krah Germany, which "set forth the terms and understanding between PIPINGusa® and [Krah Germany] to implement Krah Technology at the facilities of PIPINGusa®."  Df. RSUF ¶ 120 (brackets in original) (quoting Dkt. 213-42 at 3).  The MOU stated that it "shall become effective upon signature by the authorized persons," and that it would be appended as an "exhibit to the Contract that will be executed between PIPINGusa and KHB GmbH in December 2019."  Dkt. 213-42 at 5.

In a December 4, 2019 email and attachment, Cynthia proposed that Theetge serve as President of PIPINGusa, with a 25 percent interest in the company's revenue.  Dkt 213-8 at 2, 4.  However, under Cynthia's proposal, only the Hodnetts and Graybeal would be voting members of the company, with the Hodnetts owning 50 percent of the company's voting membership.  *Id.* at 4.  Cynthia's proposal further stated that she would be "COO/Founder" of

the company; Brad would be "Chief Marketing Officer & Chief Technology Officer/Founder"; Graybeal would be "Program Manager/Engineering/Bidding/Founder"; and Thalacker would be "Advisor/Contractor." *Id.* Theetge replied privately to Thalacker, writing: "the one red flag for me is its two votes to one," and noting that he "also [didn't] know what the significances for the 'term Founder' represents in their terms." *Id.* at 2. Theetge also wrote directly to Cynthia with his concerns: "I did notice that I am not a voting member or a part of the found [*sic*] group? Lets [*sic*] talk about that." Dkt. 219-1 at 1.

Promptly thereafter, on December 5, 2019, Brad forwarded Thalacker a proposed senior management structure "outlining the distribution and ownership percentages to be reflected in the Operating Agreement" and the Certificate of Formation for PIPINGusa LLC. Df. RSUF ¶ 107; Dkt. 215-22. The organizational structure was the same as what was reflected in Cynthia's previously circulated document, that is, Theetge was a nonvoting member with a 25 percent distribution right; the Hodnetts owned 50 percent of the voting membership of the company and were entitled to 37.5 percent of the company's distributions; and Graybeal owned 50 percent of the voting membership and was likewise entitled to 37.5 percent of the company's distributions. *Compare* Dkt. 213-8 at 4 (document circulated by Cynthia Hodnett), *with* Dkt. 215-22 at 7 (document circulated by Brad Hodnett). Around this time, the Hodnetts also prepared to move to Oregon. Dkt. 213-39 at 2; Richter Dep. at 245:15-20.

On December 8, 2019, Cynthia emailed Thalacker, stating: "I would like to increase the initial capital contribution based on expected expenses to PIPINGusa. We need to spread the risk as it adds up very quickly." Dkt. 213-45 at 2. Cynthia provided proposed ownership, distribution, and capital breakdowns. *Id.* That same day, Cynthia emailed Graybeal and Theetge, congratulating them on becoming members of PIPINGusa LLC and asking them to

make capital contributions based on their distribution percentages.  Dkt. 213-46 at 2;
Dkt. 213-47 at 2.  However, the individual Krah Defendants never made capital contributions
to PIPINGusa LLC.  Dkt. 194-2 ("Cynthia Hodnett Dep.") at 290:16-291:19.

Much unfolded over the next several days.  On December 9, 2019, Medalist provided a
summary of the PIPINGusa investment opportunity to its Investment Committee, highlighting
as credit positives Theetge's and Thalacker's experience in water irrigation and piping, and
the opportunity for an all-asset lien on the proposed business.  JSUF ¶¶ 109-110.  Medalist's
Investment Committee met that day.  Df. RSUF ¶ 135.  That same day, Regan emailed the
Hodnetts, Thalacker, and Theetge a draft Letter Loan Agreement for a $15 million revolving
line of credit between Medalist Fund and PIPINGusa, LLC.  Dkt. 213-49 at 2-3.  The parties
exchanged various drafts of the Letter Loan Agreement, incorporating edits and comments
from PIPINGusa's attorneys at Golenbock.  *See* Dkt. 213-50 at 2-5.

On December 10, 2019, Theetge, Kuzkaya, and the Hodnetts attended another meeting
at Medalist's offices in New York.  Df. RSUF ¶¶ 137-139, 141.  The deal between PIPINGusa
and Medalist did not, however, close that day.  Theetge Decl. ¶ 14.  To salvage the deal with
Krah Germany, Theetge executed a purchase order with Krah Germany on behalf of
PIPINGusa for equipment costing €3,750,000.00, and a corresponding Contract of
Cooperation and Equipment & Know-How Supply.  Dkt. 213-54 at 3-22; *see also* Theetge
Decl. ¶ 15.  Theetge maintains that, at the time of his signing, he had never seen an operating
or other agreement reflecting his ownership interest in PIPINGusa, had no verbal agreement
or understanding as to his membership interest in PIPINGusa, and had no employment
agreement or understanding of his roles and duties with PIPINGusa.  Theetge Decl. ¶ 16.
Krah Germany's Contract of Cooperation and Equipment & Know-How Supply stated that it
would be effective only after "signing by both parties and after [Krah Germany's] receipt of

the [letter of credit] and agreed down payment." Dkt. 213-54 at 20. Kuzkaya subsequently followed up by email with the Hodnetts, Theetge, and Thalacker, stating: "Congratulations and very warm welcome in the Krah Family!" Df. RSUF ¶ 149. In that email, Kuzkaya also advised the parties that Krah would "need to receive the down payment [by] the 13th, or [a] receipt of the wire transfer." Df. RSUF ¶ 149. Medalist prepared to fund a down payment totaling approximately $1.4 million for PIPINGusa's agreement with Krah Germany. Df. RSUF ¶ 148; *see also* Dkt. 213-57 at 2; Richter Dep. at 299:21-300:7.

Brad did not email Medalist and Thalacker a first draft of the PIPINGusa LLC operating agreement until after the meeting at Medalist's office. JSUF ¶ 112; Dkt. 213-56. Neither Cynthia nor Brad reviewed the operating agreement before Brad sent it to Medalist. Pl. RSUF ¶ 163-164; *see* Dkt. 213-56 at 2 (email from Brad to Regan, Hodnett, and Thalacker attaching draft operating agreement provided by counsel and noting that it had "not been reviewed by PIPINGusa"). The draft operating agreement represented that PIPINGusa LLC would consist of two corporate members: (1) Medalist Fund, which would hold 75 Class A Units, and (2) PIPINGusa Management LLC, holding 25 Class B units. JSUF ¶ 114. The agreement also designated PIPINGusa Management LLC as the manager of the company, with Cynthia as the COO, JSUF ¶¶ 115, 117, and gave the Hodnetts power of attorney, Pl. RSUF ¶ 171; *see also* Dkt. 213-56 § 8.2. The draft operating agreement also incorporated an express disclaimer of any fiduciary duty between members of the LLC. Dkt. 213-56 § 1.3(b). Theetge had no say in the operating agreement for PIPINGusa LLC. Pl. RSUF ¶ 167.

The circulation of the first draft of the operating agreement prompted a flurry of correspondence between the Hodnetts and the individual Krah Defendants. The same evening, Thalacker wrote to the Hodnetts: "I am going to need the LLC OA explained by [an] attorney." Dkt. 195-16. Theetge texted the Hodnetts the next morning, stating: "we need to

talk[.]  The LLC OA won't work."  Pl. RSUF ¶ 174 (alteration in original) (citation omitted).

The Krah Defendants maintain that, among other things, the Hodnetts had never discussed

PIPINGusa Management LLC with Thalacker, Theetge, or Graybeal, and it was never agreed

that there would be two companies: PIPINGusa LLC as the vehicle for the transaction with

Medalist, and PIPINGusa Management LLC to hold the membership interests of Thalacker,

Graybeal, and the Hodnetts.  Thalacker Decl. ¶ 28.

     Also on December 11, 2019, Brad circulated a second draft operating agreement, this

time for PIPINGusa Management LLC, a company that did not then (and does not now) exist,

again dropping Theetge from the email correspondence.  JSUF ¶¶ 120-121.  The operating

agreement for PIPINGusa Management LLC designated Cynthia as the sole manager of the

company, JSUF ¶ 123, with "responsibility and authority for the management, conduct and

operation of the Company's business in all respects and matters," and the "power and

authority to authorize and cause to be taken any action" on behalf of the company, JSUF

¶ 124 (citation omitted).  Schedule A to the Agreement stated that Cynthia Hodnett would

receive 18.75 Class A Units; Brad Hodnett would receive 18.75 Class A Units; Midge

Graybeal would receive 37.5 Class A Units; and Theetge would receive 25 Class B Units,

which did not include voting rights.  Dkt. 213-59 at 46; Pl. RSUF ¶ 190.

     Discussions between the Hodnetts and the individual Krah Defendants regarding

PIPINGusa's structure dovetailed with Medalist's concerns about the parties' respective

ownership rights in the company.  From the start, Medalist underscored that any agreement

between the parties should reflect equity allocations that would provide proper incentives to

retain and attract current and future employees.  Dkt. 200-9 at 30:19-31:13; *see also id.* at

31:5-9 (Richter to Brad Hodnett: "[S]o you're going to have a pool of equity that has to be

distributed in an equitable and rational way to ensure the future growth and prosperity of the

company.  That's the only oversight we have in this thing.").  With time, Medalist worried

that this was not reflected in PIPINGusa's proposed structure.  In a December 6, 2019 email

to Richter, Regan wrote that he "[didn't] understand why both Brad and Cindy would be

entitled to 25% ownership each as well as being 2/3rds of the voting members."  Dkt. 213-60

at 2.  Regan continued: "It seems to me that Mark Theetge would be entitled to be both a

Founder and Voting Member with more shares than both of them.  As I understand it, he and

Marc Thalacker have been putting this together for the past two years, know the product

market, and were the initial contact for the Krah relationship."  *Id.*  Regan raised their

concerns with Theetge.  Theetge Dep. at 231:4-232:11, 241:11-24.

Theetge in turn objected to the equity split proposed in the draft operating agreement.

In a December 11, 2019 email to the Hodnetts, Theetge wrote that the proposed organizational

structure was "different tha[n] discussed initially": "As I have a percentage of the business or

the third of the 25% that includes a vote as well in a LLC. . . . My voting capabilities I believe

are necessary in the growth of the business as my input and decision making in the role I have

taken on."  Dkt. 195-19 at 1; JSUF ¶ 122.  Theetge noted that, "at least in communication[s]

with [Medalist Partners]," the organizational structure "need[ed] to be correct[ed] to include

[his] vote as a shareholder," and that doing so would "strengthen the position of this

relationship with [Medalist Partners] as [his] experience in the business is additive in any

board decisions."  JSUF ¶ 122 (quoting Dkt. 195-19 at 1).  Theetge sent another email directly

to Brad later that day, stating that he "ha[d] not received any document to review . . . for

PIPINGusa," was "not privy to any conversation that has been [had] between Pipingusa and

Medalist," and that, in his review of the draft operating agreement's terms, there were "terms

that [he was] not comfortable with."  JSUF ¶ 127 (omission in original) (citation omitted).

Theetge concluded: "It seems as this needs to cool off and if we cannot have equitable terms I don't see a deal." JSUF ¶ 127 (citation omitted).

According to Brad, the deal came "to a screeching halt" that day — December 11, 2019 — because Thalacker and Graybeal "went around PIPINGusa to Medalist with a wild and unfounded accusation about an Operating Agreement with Medalist that was distributed." Dkt. 213-61 at 2; Df. RSUF ¶ 161. In an email to Thalacker, Graybeal, and Theetge, Cynthia wrote that "no one [was] returning [the Hodnetts'] calls or emails," and warned that, if the Hodnetts did not hear from Theetge, Thalacker, or Graybeal, she would "reach out to Bulent [from Krah Germany] to ensure he is aware of what is transpiring." Dkt. 195-21 at 1. In a separate email just under an hour later, Brad wrote Theetge, Thalacker, and Graybeal that he and Cynthia "ha[d] been waiting for a call from Marc and [Graybeal] for over two hours now," and warned that "[i]f there is not an amicable situation immediately, we will notify Krah and Medalist that the deal is off." Dkt. 213-61 at 2.

In response to Cynthia's email, Theetge wrote that he had already "let Bulent know that we have something to workout" and that "[i]f this is not resolved by the end of the day Bulent will pull out of line." Pl. RSUF ¶ 179 (quoting Dkt. 195-21 at 1). Later in the evening, Theetge again wrote to the Hodnetts, Graybeal, and Thalacker, this time copying Regan, and stated that he "spoke with Jim Regan with Medalist this evening," and that "[a]fter further consideration, Medalist is 'requiring' controlling interest of PIPINGusa's 25% share as follows," with all members having voting capacity:

Mark Theetge, President – Salary $137,500/Founder 1/3 interest (0.334%)

Midge Graybeal, Managing Partner/Engineering/Bidding/Founder – Salary: $137,500 1/3 Interest. (0.334%)

Cindy Creagh Hodnett, COO/Founder – Salary: $137,500 Half 1/3 interest (0.166%)

Brad Hodnett, CMO & CTO/Founder – Salary: $137,500 Half 1/3 interest (0.166%)

Marc Thalacker – Advisor

Dkt. 213-62 at 2.  Regan responded privately to just Richter, writing that he "didn't require this but told [Theetge] what [he] told [T]halacker" — "[they] thought the two Marks should have control and they should work it out amongst themselves."  *Id.*; Df. RSUF ¶ 163.  Regan continued: "We left it that they should discuss and let us know how they saw things moving forward. . . .  Seems like he is using us as the bad guy."  Dkt. 213-62 at 2.

On the evening of December 11, 2019, unbeknownst to Regan, Brad recorded a call between the pair, during which Regan reiterated that Medalist would not provide funding until Thalacker, Theetge, and the Hodnetts were "comfortable with how [they] are set up."  Pl. RSUF II ¶¶ 64-65.  Regan expressed that the group needed "to get on the same page," including with respect to "equity splits and the like."  Pl. RSUF II ¶ 65.  In response, Brad assured Regan that the matter would be "settled in house," with Thalacker, Theetge, Graybeal and the Hodnetts "decid[ing] whether to move forward or not."  Pl. RSUF II ¶ 66.  Shortly thereafter, Brad called Theetge.  Pl. RSUF II ¶ 67.  Based on a transcript of the call, Brad threatened that if Theetge did not accept the "original deal," including the voting and nonvoting rights provided therein, "we're going to have our lawyers come against everybody."  Dkt. 195-23 at 3:7-5:3. He continued: "[I]f it turns out that we're not doing it, then we're going to sick [*sic*] the lawyers on everybody," and "they're going to get all my money back, plus fuck up [Krah] and fuck up everything in the United States."  Dkt. 195-23 at 6:20-7:5.

A few hours later, Brad emailed Thalacker, Theetge, Graybeal and Cynthia, stating, "It's been a rough day for PIPINGusa.  I don't know how we come back from where this has

gone but I'm willing to try."  Dkt. 213-63 at 2.  Brad directed the parties to "find below the

roles and responsibilities that were agreed upon," with Theetge again designated as a

nonvoting member with no equity interest.  *Id.*  Brad wrote that the Hodnetts had "been

negotiating in good faith for the benefit of all parties involved" and had "never negotiated on

behalf of PIPINGusa without all parties having been aware of discussions and receiving

documentation."  *Id.* (capitalization omitted).  Theetge responded, copying Thalacker and

Graybeal: "Good luck on you [*sic*] venture with Pipingusa."  Dkt. 195-28; *see also* Theetge

Decl. ¶ 24.  Thalacker subsequently informed Medalist that they did "not have an agreement

among the members," and that they had "spoken with Krah Germany and they are aware of

the situation."  JSUF ¶ 128 (alterations adopted) (citation omitted).

On December 13, 2019, Brad emailed Thalacker and Graybeal, stating that he had not

received a response to any of his calls or emails and was "checking in to see what is going

on."  Dkt 215-36 at 2; *see* JSUF ¶ 130.  No one signed the operating agreement for either

PIPINGusa LLC or PIPINGusa Management LLC.  JSUF ¶ 129; *see also* Cynthia Hodnett

Dep. at 106:19-22.  Ultimately, no loan agreement was signed between PIPINGusa LLC or

PIPINGusa Management LLC and Medalist.  JSUF ¶ 131.

### D.  The Formation of Krah USA

As negotiations between the Hodnetts and the individual Krah Defendants broke

down, on December 12, 2019, Theetge submitted an application to incorporate Krah USA

LLC in the State of Delaware.  Df. RSUF ¶ 167.  Theetge and Graybeal were listed as

members of the LLC, Df. RSUF ¶ 168; *see also* Dkt. 213-64 at 3, and Theetge forwarded the

confirmation of the application to Thalacker and Graybeal, Df. RSUF ¶ 169.  Regan

subsequently spoke with Thalacker and informed Richter that he had learned that "[t]he group

could not come to an agreement and will not be moving forward as PIPINGusa."  Dkt. 213-65

at 2. Regan stated that "[Thalacker] asked if we would be interested in doing it with a new LLC, Krah USA. It would be [Graybeal] and Marc Theetge." *Id.* He continued: "Apparently things got a little heated between the folks and Theetge decided he couldn't move forward with Brad after their discussions." *Id.* Regan also asked Thalacker and Theetge to provide a description of the new management team's structure, per his discussions earlier that day with Thalacker. Dkt. 213-66 at 2.

That same day, Kuzkaya emailed Theetge and Cynthia, copying Thalacker and Brad, to remind them of their "agreement on the payment terms" and, in particular, to reiterate that a down payment of 30 percent was due the next day, December 13, 2019. Df. RSUF ¶ 173. On December 13, 2019, at 5:24 a.m., Kuzkaya emailed Theetge and Thalacker attaching an order confirmation and invoices relating to Krah USA LLC, as opposed to PIPINGusa. Df. RSUF ¶ 176. Theetge forwarded the email to Graybeal and Thalacker, writing: "[Kuzkaya] is looking for signature for this today. . . . I don't know what is best but he needs it today. [Kuzkaya] is sending the cancellation to PipingUSA . . . in about 5mins . . . ." Df. RSUF ¶ 177. Indeed, Kuzkaya shortly thereafter canceled the purchase order with PIPINGusa LLC due to the parties' nonpayment of the 30 percent down payment. Df. RSUF ¶ 178. At that time, Theetge executed a Contract of Cooperation and Equipment & Know-How Supply between Krah Germany and Krah USA. Df. RSUF ¶ 180. There was no material difference between the contract previously signed by Theetge on behalf of PIPINGusa and the one signed on behalf of Krah USA. *See* Thalacker Dep. at 342:2-343:11; Richter Dep. at 389:7-9.

On December 14, 2019, Graybeal emailed Richter and Regan, copying Theetge and Thalacker, attaching "the last loan agreement that [they] saw" and noting that they had "converted it to Krah USA LLC company." Dkt. 213-73 at 2; *see also* Df. RSUF ¶ 189. The

draft loan agreement was also substantively identical to the prior draft PIPINGusa loan agreement.  Df. RSUF ¶¶ 191-192.

On December 16, 2019, Thalacker, Theetge, and Graybeal emailed Medalist information pertaining to the roles and responsibilities of each member of Krah USA LLC.  JSUF ¶ 133.  Medalist responded that "funding will be dependent" upon its review of an operating agreement "along with receipt of the executed Letter Loan Agreement and the signed Promissory Note."  JSUF ¶ 134 (alteration adopted) (citation omitted).  The following day, Thalacker, Theetge and Graybeal forwarded Medalist an executed loan agreement for Krah.  JSUF ¶ 135.  The terms of Medalists' loan to Krah USA were the same as those set forth in the draft loan agreement prepared for PIPINGusa.  Df. RSUF ¶ 195; *see also* Dkt. 199-2 at 391:19-392:22.  From Medalist's perspective, "the economic terms of the transaction with Krah USA LLC were the same as those previously discussed when the Hodnetts had been contemplated as members of the business enterprise," that is, Medalist was to receive 75 Class A units, with preferential returns, until such time as the company achieved certain targets.  Richter Decl. ¶ 29 (emphasis omitted).  On December 19, 2019, Graybeal emailed Richter and Regan what Medalist understood to reflect the final operating agreement between the Krah Defendants regarding the piping business.  Dkt. 213-78 at 2; Pl. RSUF II ¶ 82.

The next day, Medalist wired $1.4 million to Krah USA.  Df. RSUF ¶ 201.  Medalist never prepared a new credit memo or term sheet for Krah USA, on the understanding that the transaction still involved "[a] similar structure" and "most of the same participants" as when it was being negotiated under the name PIPINGusa.  Dkt. 213-19 at 321:13-322:6.

In February 2020, the Hodnetts sent Richter and Regan a demand letter, which Richter forwarded to Regan, writing: "We never signed any agreement with them so we are fine."  Df.

RSUF ¶ 206.  On August 19, 2022, Thalacker and Graybeal executed an Assignment and Assumption of Membership Interest for $1.00, with Graybeal assigning all her rights, title, and interest in the company to Thalacker.  Df. RSUF ¶ 207; Dkt. 213-81 at 2-4.

Today, Krah USA has exhausted the initial $15 million credit facility and currently has an outstanding balance of $24 million.  JSUF ¶ 136.  In 2023, Krah USA lost $4.9 million.  Pl. RSUF ¶ 212.  Although it was projected that Medalist's loan would be repaid within four years, with distributions to Krah USA's members beginning shortly thereafter, Krah USA has made only minimal payments and no distributions have been made to Krah USA's members. Pl. RSUF II ¶ 87.  Medalist has deemed the position impaired and has not recouped its initial investment or reached any targeted rate of return.  JSUF ¶ 136.  However, Krah USA's internal forecasts extend to 2026, and those internal forecasts still show Krah turning a profit. Df. RSUF ¶¶ 215-216.

## III.   Procedural History

The Medalist Defendants removed this action to federal court from the Supreme Court of New York, New York County, on January 4, 2021.  Dkt. 1.  Plaintiffs thereafter moved for a preliminary injunction, Dkt. 17, which Judge Vyskocil denied, Dkt. 54.  On February 23, 2021, Plaintiffs filed a Second Amended Complaint, Dkt. 70, which Defendants jointly moved to dismiss on May 26, 2021, Dkt. 71.  On September 2, 2022, Judge Vyskocil denied Defendants' joint motion to dismiss.  Dkt. 81.

On September 26, 2022, this case was reassigned to the undersigned.  Dkt. 85.  On June 6, 2023, having been advised that all claims asserted in the action had settled in principle, the Court dismissed the action without prejudice to reopening in the event the parties failed to consummate settlement.  Dkt. 117.  On October 13, 2023, the Court granted

Plaintiffs' unopposed request to reopen the case given that the parties had not yet consummated a settlement agreement.  Dkt. 128.

The Hodnetts' legal counsel subsequently moved to withdraw from this action on October 20, 2023, citing a "complete breakdown in communication" with their clients, Dkt. 131 ¶ 4, and the Court granted the motion on November 9, 2023, Dkt. 138.  After granting the Hodnetts multiple extensions over many months to retain new counsel, the Court granted a final deadline of April 8, 2024, for Plaintiffs to have new counsel appear, and directed that failure to comply with the Court's order would result in dismissal of all claims brought on behalf of the corporate entity, PIPINGusa LLC, which cannot appear without counsel.  Dkts. 139-143, 148, 149, 151, 161.  Notwithstanding the Court's order, the Hodnetts filed a fourth request for an extension of time on April 7, 2024.  Dkt. 162.  By order dated April 19, 2024, the Court denied the Hodnetts' request for a further extension and ordered that all "[c]laims asserted on behalf of PIPINGusa, LLC [be] dismissed."  Dkt. 168 at 3.  As a result, the only outstanding claims in this action are claims brought on behalf of the individual Hodnett Plaintiffs, namely (1) Plaintiffs' second cause of action for breach of fiduciary duty against Thalacker, Graybeal, and Theetge, Dkt. 70 ¶¶ 75-81; (2) Plaintiffs' seventh cause of action for breach of contract against Medalist Fund, *id.* ¶¶ 104-109; and (3) Plaintiffs' tenth cause of action for aiding and abetting breach of fiduciary duty against Medalist Partners, Medalist Fund, and Richter, *id.* ¶¶ 120-124.

On October 4, 2024, the Krah Defendants filed a motion for summary judgment. Dkt. 193; Dkt. Krah Br.  Also on October 4, 2024, the Medalist Defendants filed a motion for summary judgment.  Dkt. 198, Medalist Br.  Defendants also filed a joint motion to preclude the expert testimony of Ronald Quintero, Plaintiffs' damages expert.  Dkt. 205, Daubert Br.

Plaintiffs cross-moved for summary judgment the same day.  Dkt. 211, Pl. Br.  All motions are fully briefed.

## LEGAL STANDARD

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "[t]here is 'no genuine dispute as to any material fact' where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts . . . ; or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law . . . ."  *Cole*, 2015 WL 5737275, at *3 (citation omitted) (first citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and then citing *Liberty Lobby*, 477 U.S. at 248).  A fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Liberty Lobby*, 477 U.S. at 248.  Thus, "the substantive law will identify which facts are material."  *Id.*

At summary judgment, the court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  The court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary

judgment is sought." *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "Affidavits submitted in support of or in opposition to the summary judgment motion must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(4). "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *Cole*, 2015 WL 5737275, at *3 (quoting *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-08140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug 5, 2013)).

## DISCUSSION[4]

The Court will first consider the parties' cross-motions for summary judgment, and then Defendants' *Daubert* motion to exclude Plaintiffs' damages witness, Quintero.

### I.    Breach of Fiduciary Duty

Both Plaintiffs and the Krah Defendants move for summary judgment on Plaintiffs' breach of fiduciary duty claim against the Krah Defendants. Plaintiffs allege that PIPINGusa was a joint venture among the Hodnetts and the Krah Defendants, and that the Krah Defendants breached their fiduciary duty of loyalty by diverting PIPINGusa's business opportunities to themselves. *See* Dkt. 70 ¶¶ 75-81; Pl. Br. at 14. The Krah Defendants, in

---

[4] All the parties rely upon New York law in their briefs. Therefore, the Court will apply New York law to the instant claims. *See, e.g.*, *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (holding that where "[t]he parties' briefs assume that New York substantive law governs the issues," "such implied consent is . . . sufficient to establish the applicable choice of law"); *accord Heath v. EcoHealth Alliance*, No. 23-cv-08930 (JLR), 2024 WL 5168072, at *2-3 (S.D.N.Y. Dec. 19, 2024).

turn, maintain that no reasonable juror could conclude that a joint venture was formed between the parties, Krah Br. at 18-27, and that the Krah Defendants did not in any event breach any fiduciary duty, *id.* at 27-28.

"Under New York law, '[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'" *Turner v. Temptu Inc.*, No. 11-cv-04144 (JMF), 2013 WL 4083234, at *8 (S.D.N.Y. Aug. 13, 2013) (alteration in original) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d. Cir. 2011)), *aff'd*, 586 F. App'x 718 (2d Cir. 2014) (summary order). Thus, Plaintiffs' breach of fiduciary duty claim requires the existence of a joint venture between the parties such that the Krah Defendants owed the Hodnetts a fiduciary duty.

Accordingly, the initial question for this Court is whether the Hodnetts and the individual Krah Defendants entered into a joint venture that gave rise to fiduciary obligations. As set forth below, that threshold question is rife with factual disputes that preclude summary judgment for either side.

### A. Formation of Joint Venture

"To form a joint venture in New York, '[i]t is not enough that the parties have agreed to act in concert to achieve some stated economic objective.'" *Turner*, 2013 WL 4083234, at *6 (alteration in original) (quoting *Abbas Corp. v. Michaael Aziz Oriental Rugs, Inc.*, 820 F. Supp. 2d 549, 554 (S.D.N.Y. 2011)). "Under New York law, a joint venture is formed when (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses." *SCS Commc'ns, Inc. v. Herrick*

*Co.*, 360 F.3d 329, 341 (2d Cir. 2004). "The absence of any one of these elements is fatal to the establishment of a joint venture." *Turner*, 2013 WL 4083234, at *6 (alteration adopted) (quoting *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc*., 765 F. Supp. 2d 403, 411-12 (S.D.N.Y. 2011)). "The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for purpose of the particular adventure their respective contributions have become as one and the . . . interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Sea Shipping Inc. v. Half Moon Shipping, LLC*, 848 F. Supp. 2d 448, 458 (S.D.N.Y. 2012) (omission in original) (quoting *Hasday v. Barocas*, 115 N.Y.S.2d 209, 215 (Sup. Ct. 1952)).

### 1. Intent to be Joint Venturers

"[U]nder New York law, even where there is no express joint venture agreement, a joint venture may exist 'based upon the *implied* agreement evidenced by the parties' conduct.'" *Sea Shipping Inc.*, 848 F. Supp. 2d at 458 (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P*., 765 N.Y.S.2d 575, 583 (App. Div. 2003)). Where the alleged agreement is implicit, "parties may demonstrate their intent by combining their property and efforts in a manner such that they are necessarily subject to their joint venturers' corresponding efforts and potential failures." *Milton Abeles, Inc. v. Creekstone Farms Premium Beefs, LLC*, No. 06-cv-03893 (JFB) (AKT), 2009 WL 875553, at *5 (E.D.N.Y. Mar. 30, 2009) (citing *Kid Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004)). Moreover, "[a] joint venture can be found to exist even where the parties merely reach a basic agreement with an 'intent to hammer out details subsequently.'" *Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.* (*Hodnett I*), No. 21-cv-00038

(MKV), 2022 WL 4072935, at *9 (S.D.N.Y. Sept. 2, 2022) (quoting *Richbell*, 765 N.Y.S.2d at 584).

Plaintiffs maintain that the Hodnetts and Krah Defendants were "working toward the common goal of establishing PIPINGusa," Pl. Br. at 15, and that each of the parties made contributions toward the alleged venture, demonstrating their intent to act as cofiduciaries, *id.* at 14-17. The Krah Defendants disagree, arguing that Plaintiffs' formation of a limited liability company — PIPINGusa LLC — bars Plaintiffs' claim for breach of a fiduciary duty as a matter of law. Krah Br. at 19-20. According to the Krah Defendants, the formation of PIPINGusa LLC evinces that Plaintiffs' intention was to operate not as a joint venture, but through a corporate entity. *Id.* at 20.

Defendants cite, among other authorities, to the New York Court of Appeal's decision in *Weisman v. Anwair Corp. of America*, 144 N.E.2d 415 (N.Y. 1957). *See* Krah Br. at 20. *Weisman* held that an agreement between parties to distribute and sell the defendant's products through a corporate entity could not be a joint venture because "the rule is well settled that a joint venture may not be carried on by individuals *through* a corporate form." 144 N.E.2d at 418 (emphasis added). The court concluded that when parties "adopt the corporate form . . . they cease to be partners and have only the rights, duties and obligations of stockholders," that is, parties "cannot be partners *inter sese* and a corporation as to the rest of the world." *Id.* (citation omitted).

But "[w]hile case law exists standing for the proposition that a joint venture ceases to exist when the parties form a corporation to carry out one or more of its objectives," *Richbell*, 765 N.Y.S.2d at 585, New York courts have increasingly cabined that proposition, recognizing that joint ventures and corporations can (and often do) coexist. Indeed, post-*Weisman* cases have imposed substantial limitations on *Weisman*'s otherwise sweeping

assertion that a joint venture and corporate entity are necessarily mutually exclusive.   In

*Sagamore Corp. v. Diamond West Energy Corp.*, the Second Circuit acknowledged that "[t]he

broad language of *Weisman* . . . has been limited by subsequent New York decisions."  806

F.2d 373, 378 (2d Cir. 1986).  *Sagamore* held that "when the parties to a joint venture

agreement, in forming a corporation to carry out one or more of its objectives, intend to

reserve certain rights *inter sese* under their agreement, which do not interfere with or restrict

the management of the affairs of the corporation, its exercise of corporate powers, or the

rights of third parties doing business with it . . . such joint venture agreement may be

enforced."  *Id.*  And *Sagamore* is far from alone in embracing a more permissive approach to

the coexistence of a joint venture and a corporation: "A significant majority of New York

courts have recognized that co-venturers may legally retain their joint venture status among

themselves while operating as a corporation to the rest of the world and that the subsequent

incorporation of a joint venture does not obviate the existence of a joint venture unless the

parties specifically intended to merge the joint venture into the corporation."  *Cosy Goose*

*Hellas v. Cosy Goose USA Ltd.*, 581 F. Supp. 2d 606, 619-20 (S.D.N.Y. 2008) (collecting

cases); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 334 (S.D.N.Y. 2005) ("New York

courts have held that a pre-incorporation contractual obligation between joint venturers

survives incorporation of the joint venture . . . to the extent that the obligation does not

'conflict with the corporation's functioning' and the rights of third party-creditors are not

involved.'" (quoting *Richbell*, 765 N.Y.S.2d at 585)).  "In short, New York courts have

recognized that despite the all-inclusive, hard-and-fast pronouncement of *Weisman*[,] . . .

'there is little logical reason why individuals cannot be "partners *inter sese* and a corporation

as to the rest of the world," so long as the rights of third parties such as creditors are not

involved.'" *Sagamore*, 806 F.3d at 379 (alteration adopted) (quoting *Arditi v. Dubitzky*, 354 F.2d 483, 486 (2d Cir. 1965)).

With that legal framework, the Court finds that the record does not support a finding, as a matter of law, that the formation of PIPINGusa LLC displaced any purported joint venture between the parties. It is undisputed that a corporate structure was necessary to obtain funding from Medalist. Pl. RSUF ¶¶ 123-124. It is also undisputed that the operating agreements for PIPINGusa LLC and PIPINGusa Management LLC were never in fact executed. *Id.* ¶¶ 149, 194. PIPINGusa LLC was never operational and never conducted any business. Therefore, there could not, as a practical matter, have been any "merger" of the joint venture and the parties' anticipated corporate entity here such that the venture was subsumed by the LLC. *Cf. Sagamore*, 806 F.2d at 378 ("When the parties intend to merge their entire joint venture, including their rights *inter sese* and the conduct of the business enterprise planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stockholders.").

Nor can the Court conclude as a matter of law that Plaintiffs "specifically intended to merge" the purported "joint venture into the corporation." *Cosy Goose Hellas*, 581 F. Supp. 2d at 619-20. As *Sagamore* and other New York courts have clarified, where a separate entity is "formed to 'carry out [a joint venture],'" *Sagamore*, 806 F.2d at 375, the entity and joint venture can exist alongside each other, so long as the "parties' rights under . . . the joint venture . . . are 'not in conflict' with the corporation's functioning," *Richbell*, 765 N.Y.S.2d at 585. Thalacker himself referred to PIPINGusa LLC as "the vehicle for the transaction with Medalist," and PIPINGusa Management LLC as a holding company for "the individual membership interests of Mark, [Graybeal], and the Hodnetts." Thalacker Decl. ¶ 28. Accordingly, the LLCs appear to have been vehicles for facilitating the joint venture's broader

objective: the attainment of corporate opportunities for a piping business operating in the Pacific Northwest.  Indeed, courts routinely uphold joint ventures when the parties form a corporation to "facilitate" the joint venture's objectives.  *See, e.g.*, *Sea Shipping Inc*, 848 F. Supp. 2d at 450, 458 (upholding joint venture where the parties entered into shareholders' agreements and formed corporations to "facilitate" their project to purchase and operate tanker vessels); *Richbell*, 765 N.Y.S.2d at 579, 585 (finding that establishment of holding company as "the corporate vehicle to carry out [the parties'] joint venture" did not terminate the joint venture).  Thus, there is at least a question of fact as to the intention of the parties in this regard.  *See, e.g.*, *Arditi*, 354 F.2d at 487 (finding that "[t]he plaintiff [was] entitled to attempt to show at trial that the intention of the parties [was] . . . to set up a corporation only as a means of carrying out their joint venture," with the corporation intended to be "merely an instrumentality of the joint venture").

In arguing otherwise, the Krah Defendants point to language in PIPINGusa LLC's and PIPINGusa Management LLC's draft operating agreements expressly disclaiming fiduciary duties between the members: "The Members intend that the Company not be a partnership (including a limited partnership) or joint venture," Dkt. 195-15 § 1.3(b), and "none of the Members . . . shall have any fiduciary or similar duty or obligation to the Company or any of the Members," Dkt. 195-24 § 2.3(d); *see* Krah Opp. at 14; Krah Reply at 2-3.  But there is no inconsistency between Plaintiffs' assertion of a joint venture and the proposed terms of the operating agreements.  The draft agreements (initially prepared by counsel without input from the parties) merely state that the corporate entities "will not be a partnership . . . or joint venture" and members will not be joint venturers "*by virtue of* [*the Operating*] *Agreement*." Dkt. 195-15 § 1.3(b) (emphasis added).  That says nothing about the parties' ability to form a joint venture independently of (and prior to) the LLC, which a fact finder could determine

occurred here.  In any event, since the operating agreements were never in fact executed, the Court does not find their disclaimers dispositive of the question of the parties' intent to form a joint venture.  *See Colle v. Goldman*, No. 05-cv-03981 (JG), 2007 WL 1395561, at *7 (E.D.N.Y. May 14, 2007) (holding that documentary evidence, including draft LLC agreement incorporating an express disclaimer of fiduciary duties, "[did] not dispose of the question of intent, because a joint venture need not be in writing" (internal quotation marks omitted)).

Defendants' other cited authorities do not compel a different outcome.  Not only do Defendants' authorities rely on a doctrine that has since become more circumscribed, but Defendants' cases also involved corporate entities that were in fact operational and conducting business.  *See, e.g.*, *WMW Mach., Inc. v. Werkzeugmaschinehandel GmbH IM Aufbau*, 960 F. Supp. 734, 737, 746 (S.D.N.Y. 1997) (finding no joint venture where purported coventurers had "established" their ownership in a corporate entity intended to facilitate joint venture's objective); *Laurelle Mfg. Corp. v. Truly Yours, Inc.*, No. 85-cv-09080 (CMM), 1991 WL 222173, at *2, *3-4 (S.D.N.Y. Oct. 31, 1999) (holding that there was no joint venture where parties "operated under the corporate form," having established a corporation that actually conducted business, including executing agreements); *see also Weisman*, 144 N.E.2d at 747, 749-50 (finding no joint venture where plaintiffs incorporated a business that "commenced extensive and exhaustive advertising, selling, distributing, and merchandising" of defendants' products).  Here, PIPINGusa LLC's operating agreement was never executed; it never conducted any business; and it was never operational.  Therefore, as noted above, a fact finder could conclude that there was not a "complete merger" of the joint venture into the corporate form, such that the corporate form "supplant[ed] the venture."  *Sagamore*, 806 F.2d at 379. Thus, the parties "should have an opportunity to present such facts as they may be able to

adduce" as to whether the joint venture agreement was merged into the corporation and extinguished such that the parties did not intend to be joint venturers. *Arditi*, 354 F.2d at 487.

### 2. Joint Control

Another required element for a joint venture is that each venturer has some degree of joint control over the venture. "The control deemed essential for a joint venture is power over decision-making." *Stratford Grp.*, *Ltd. v. Interstate Bakeries Corp.*, 590 F. Supp. 859, 863 (S.D.N.Y. 1984). "[A] joint venture will not exist where one party has all, or virtually all, of the management of the business, and the other lacks independent decision-making authority or co-management or control." *Jobanputra v. Kim*, No. 21-cv-07071 (ER), 2023 WL 5352400, at *6 (S.D.N.Y. Aug. 21, 2023). "[I]t is not required," however, "that each joint venturer actually exercise the *same* degree of management control." *Richbell*, 765 N.Y.S.2d at 585 (emphasis added). "The inquiry as to the existence of this factor is limited to whether a member of the venture had *any* measure of control" over decision-making. *Id.*; *see also Barnes v. Block*, No. 22-cv-07236 (LTS) (RWL), 2025 WL 1736519, at *8 (S.D.N.Y. June 23, 2025) ("Control need not be *equal* to satisfy this element, so long as each party exercised '*any* measure of control.'" (quoting *Richbell*, 765 N.Y.S.2d at 585)).

Defendants contend that the evidentiary record shows that "Plaintiffs did not intend to share joint control/management over any prospective business," and "instead sought sole control." Krah Opp. at 19. Specifically, the Krah Defendants assert that the Hodnetts independently incorporated PIPINGusa LLC and made themselves the only members (and Cynthia the sole managing member); opened a bank account for the corporate entity that only they could access; prepared the operating agreements for PIPINGusa LLC and PIPINGusa Management LLC without consulting anyone; and granted themselves sole power of attorney. Krah Br. at 21-22; Krah Opp. at 17-18. The Krah Defendants also point to Brad Hodnett's

testimony that he and his wife needed to have "control of the entity" to move the project forward.  Krah Br. at 22 n.13 (citing Brad Hodnett Dep. at 51).  Plaintiffs disagree, noting that the "roles and responsibilities" documents they circulated designated both the Hodnetts and the Krah Defendants as part of PIPINGusa's management team, and provided that the Hodnetts and Krah Defendants would share voting equity in PIPINGusa.  Pl. Br. at 17.

The Court finds that the issue of control raises disputed issues of material fact.  While the Krah Defendants contend that the draft proposal of roles and responsibilities is "unpersuasive" because it was unilaterally sent by the Hodnetts, the document was circulated to the Krah Defendants.  A reasonable inference from the Krah Defendants' silence in response to the Hodnetts' circulation of these documents — and the subsequent escalation of the "roles and responsibilities" document to Medalist — is that the Krah Defendants tacitly assented to the joint management roles set forth therein.  *See, e.g.*, *Don v. Singer*, 939 N.Y.S.2d 363, 363 (App. Div. 2012) (finding an issue of fact with respect to defendants' intent where, among other things, defendant "remain[ed] silent when provided with each of the subject agreements and when repeatedly introduced as plaintiffs' partner"); *Growblox Scis., Inc. v. GCM Admin. Servs.*, No. 14-cv-02280 (ER), 2015 WL 3504208, at *8 (S.D.N.Y. June 2, 2015) (noting that indicia of joint venture include parties jointly "serv[ing] as officers, directors, or stockholders of the same entity," or "otherwise exercis[ing] joint control over its day-to-day operations").

In that proposal and in their actions, each of the parties appears to have exercised or been designated decisionmaking authority over their respective domains of expertise.  For instance, as Plaintiffs point out, Theetge was designated "President" of PIPINGusa and executed a contract with Krah GmbH in that capacity, Medalist RSUF ¶¶ 106, 142, as well as engaged with prospective vendors on behalf of PIPINGusa, *id.* ¶ 118.  Thalacker led

negotiations for the lease of a manufacturing site on behalf of PIPINGusa. *Id.* ¶ 32. Graybeal was responsible for hiring the production team for the PIPINGusa manufacturing facility, *id.* ¶ 35, and also hired counsel to draft a lease for PIPINGusa's manufacturing site in Oregon, *id.* ¶ 111. That each of the parties had the ability to bind the company and took measures to that end at least raises a factual dispute with respect to whether they jointly controlled the venture. Indeed, "the inquiry is not demanding, as 'any measure of control' will usually suffice." *Slinin v. Shnaider*, No. 15-cv-09674 (RJS), 2019 WL 13214733, at *8 (S.D.N.Y. Oct. 1, 2019) (quoting *Richbell*, 765 N.Y.S.2d at 585). To the extent that the Hodnetts took actions consistent with the exercise of sole control — for instance, designating themselves as the sole members of the LLC; designating Cynthia Hodnett as the sole managing member; and giving themselves sole access to the LLC's bank account — there is at least a factual question as to whether these were temporary measures undertaken by the Hodnetts in initially creating the LLC. *See Colle*, 2007 WL 1395561, at *7 (denying summary judgment where evidence that defendant had the "final word" could be interpreted "not to imply [defendant's] final and exclusive decision-making power, but rather a practical understanding between business partners that they would reach a consensus to responsibly discharge their fiduciary responsibilities to each other before making decisions"). Indeed, the operating agreements that were drafted delineated how the alleged joint venturers would exercise their control and decisionmaking authority: Theetge was designated President of the company, Cynthia was designated COO/Founder, Brad had the role of CMO & CTO/Founder, and Graybeal was designated Program Manager/Engineering/Bidding/Founder. Dkt. 200-16 at 10.

For the aforementioned reasons, the Court finds that whether there was joint control between the parties is a matter of disputed fact.[5]

### 3. Contribution

The Court next examines Plaintiffs' claims that the alleged joint venturers contributed property, financing, skill, knowledge, or effort.  That Theetge, Graybeal, and Thalacker each made contributions to PIPINGusa is undisputed.  Thalacker contributed "unique industry knowledge" and "relationships with Oregon's water districts," JSUF ¶ 18, and participated in calls and meetings with Medalist, *id.* ¶ 79.  Graybeal contributed business-management and marketing expertise, and retained counsel to draft lease documentation for PIPINGusa's manufacturing site.  *Id.* ¶ 19; Medalist RSUF ¶ 111.  And Theetge contributed decades of

---

[5] Defendants' inapposite authorities reflect partnerships where all managerial and decisionmaking authority was clearly consolidated in one party, such that a lack of joint control was self-evident from the record.  *See, e.g.*, *Int'l Equity Invs. Inc. v. Opportunity Equity Partners, Ltd*., 472 F. Supp. 2d 544, 547-48, 553 (S.D.N.Y. 2007) (no joint control where the parties' partnership agreement provided defendant with "exclusive authority over the 'management, control, operation and policy' of the partnership" *id.* at 547, and precluded plaintiff from "participating in the management, control or direction" of the fund's affairs or "from transacting business" for the fund, *id.* at 548); *Orderline Wholesale Distribs. Inc. v. Gibbons, Green, van Amerongen, Ltd*., 675 F. Supp. 122, 127 (S.D.N.Y. 1987) (no joint venture where defendant was "proceeding independently" in "structuring an acquisition" and "[plaintiff's] role in [defendant's] acquisition was that of a passive investor"); *Scott v. Rosenthal*, No. 97-cv-02143 (LLS), 2000 WL 1863542, at *3 (S.D.N.Y. Dec. 20, 2000) (no joint venture where plaintiff "was not an officer, director or stockholder of [the company], [and] had no control over or ownership interest in any of its assets" or, among other things, "authority to sign checks on its behalf"); *Williams Trading LLC v. Wells Fargo Sec., LLC*, No. 12-cv-05984 (KBF), 2013 WL 1718916, at *6 (S.D.N.Y. Apr. 18, 2013) (no joint control arising from referral fee agreement where "nothing in the [parties' agreement] provided plaintiff with *any* right of input . . . over the Wells Fargo options trading desk" (emphasis added)), *aff'd*, 553 F. App'x 33 (2d Cir. 2014) (summary order); *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985) (no joint power or control where plaintiff's "powers and responsibilities were limited by [defendant]," he "was not able to operate outside of [defendant's] direction and control," and he did not "have the power to hire or to enter into binding contracts"); *Rivkin v. Coleman*, 978 F. Supp. 539, 543 (S.D.N.Y. 1997) (no joint venture between employer and employee where employee had no authority to consummate agreements, never held herself out as a partner, and held responsibilities consistent with those of a salaried office manager).

industry and sales experience, as well as a personal relationship with Krah Germany.  JSUF ¶ 77; Medalist RSUF ¶ 111.

The parties' dispute centers on the degree of the Hodnetts' contributions to any purported joint venture.  Plaintiffs argue that they contributed "business strategy and accounting expertise and connections," including contributing the name of the joint venture; leading efforts to review and revise the preexisting business plan; pitching the joint venture to Medalist; fielding Medalist's business questions and facilitating calls and meetings between Medalist and PIPINGusa; and engaging the Krah Defendants in dozens of hours of phone calls concerning their mutual efforts.  Pl. Br. at 15.  The Krah Defendants maintain that "the record is . . . clear that Theetge, Thalacker and Graybeal brought all of the experience, expertise, know-how, contacts and did virtually all of the work on the Business Plan and contacted Medalist for funding," underscoring that Plaintiffs' limited involvement took place over all of six weeks.  Krah Br. at 26.

The Court finds issues of fact in this regard, drawing all inferences in favor of the nonmoving party.  While it is undisputed that the Hodnetts were involved for a shorter time frame, given the evidence presented by Plaintiffs of their involvement, a reasonable juror could conclude from the record that the Hodnetts contributed skills and efforts to the parties' alleged joint venture.

### 4.  Sharing of Profits and Losses

Finally, a joint venture requires that "the existence of 'a mutual promise or undertaking of the parties to share in the profits . . . *and submit to the burden of making good the losses*.'"  *Colle*, 2007 WL 1395561, at *8 (omission in original) (quoting *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 690 (2d Cir. 1983)).  The Krah Defendants argue that no joint

venture was formed because "[t]here is zero evidence demonstrating an agreement to share losses."  Krah Br. at 23.

Plaintiffs respond that, "[f]rom commencement of their joint venture, the Hodnetts, on the one hand, and Thalacker and Graybeal, on the other, planned a 50/50 split of PIPINGusa." Pl. Br. at 19.  To the extent that the parties' agreement did not expressly address the sharing of losses, Plaintiffs assert that "such an agreement was not required because the co-venturers did not anticipate incurring losses."  *Id.* at 18.  The Krah Defendants respond that Plaintiffs are relying on a "disfavored and rarely applied exception" to the shared-losses requirement, and that in any event there is "zero evidence that the exception applies here."  Krah Reply at 7.

As for an agreement to share profits, the Court finds that the parties at least discussed the split of profits; whether they reached agreement on that point or not is a genuine dispute best resolved by fact finders at trial.  It is undisputed that Plaintiffs circulated roles and responsibilities documents including proposed equity splits and distribution rights to the Krah Defendants.  With the exception of Theetge objecting to his equity split, the circulation of those documents — and their subsequent escalation to the Medalist Defendants — was not met with any objection.  *See, e.g.*, *Don*, 939 N.Y.S.2d at 363 (finding an issue of fact with respect to whether conduct manifested an intention to be bound as joint venturers where, among other things, defendant "remain[ed] silent when provided with each of the subject agreements and when repeatedly introduced as plaintiffs' partner").  As for Theetge, Cynthia testified that the parties, Theetge included, reached agreement on roles and responsibilities, equity, and voting rights during a meeting held on the morning of the December 10, 2019 Medalist meeting.  Dkt. 199-2 at 362:9-363:18.  Any credibility determinations regarding those discussions are best left for the jury.

With respect to losses, it is undisputed that the parties did not expressly discuss an agreement to share losses.  Brad Hodnett admitted as much, testifying that he did not recall an agreement to share in the downside.  Dkt. 194-4 at 277:5-78:8.  However, there were discussions about increasing capital contributions in order to "spread the risk" between the parties.  *See, e.g.*, Dkt. 213-45 at 2 (December 8, 2019 email from Cynthia to Thalacker, stating: "I would like to increase the initial capital contribution based on expected expenses to PIPINGusa.  We need to spread the risk as it adds up very quickly.").  In any event, a lack of agreement to share losses is not necessarily dispositive.  Plaintiffs are correct that the Second Circuit recently held that "[u]nder New York law, a joint venture can be formed without loss-sharing where 'there was no reasonable expectation of losses.'" *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 129 (2d Cir. 2023) (quoting *Don*, 939 N.Y.S.2d at 364).  In *Fat Brands*, the Second Circuit found that parties to a purported partnership agreement did not anticipate losses where the "enterprise's business model did not include assuming credit risk or, indeed, any losses other than unrecouped overhead expenses."  *Id.*; *see also Barnes*, 2025 WL 1736519, at *8 ("The only exception to [the rule of loss-sharing] is when a particular partnership or joint venture did not entail any 'reasonable expectation of losses.'" (quoting *Fat Brands*, 75 F.4th at 129)).  In disparaging this exception as "disfavored and rarely applied," the Krah Defendants conveniently omit any reference to the Second Circuit's recent decision in *Fat Brands* and instead cite to *Fisher v. Tice* — a nonprecedential Second Circuit case issued prior to *Fat Brands* — and other pre–*Fat Brands* cases.  Krah Opp. at 22 & n.15 (first citing *Fisher v. Tice*, 692 F. App'x 54, 56-57 (2d Cir. 2017) (summary order); then citing *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 519 (App. Div. 2021); and then citing *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013)).

Plaintiffs argue that PIPINGusa's operating costs were to be financed "exclusively" through Medalist's loan to PIPINGusa LLC, with the LLC "bear[ing] the credit risk associated with that loan."  Pl. Opp. at 24; *see also* N.Y. Ltd. Liab. Co. Law § 609(a) (members of a limited liability company are not liable for company's obligations, debts, or liabilities).  As Plaintiffs note, the draft operating agreements for PIPINGusa LLC and Krah USA disclaimed personal liability for the LLC's obligations.  Dkt. 195-15 § 2.3(a) ("No Member shall have any personal liability for any obligations or liabilities of the Company whatsoever except if and then only to the extent expressly required in the [Delaware Limited Liability Company Act].");  Dkt. 235-84 § 1.7(g) ("Except as otherwise provided in the [Delaware Limited Liability Company Act of 2016], no Member . . . shall have any liability to the Company, any of the other Members or any of the creditors of the Company for the debts, liabilities, contracts or other obligations of the Company or any of the Company's losses.").  While Defendants argue that the LLC would certainly have incurred losses in connection with the "leasing of property, the purchase of manufacturing equipment and other supplies, and the hiring of employees," Krah Reply at 8, PIPINGusa's business plan projected that such expenses would be covered by the $15 million initial investment of capital, *see* Dkt. 195-5 at 19.  Thus, the Court finds that whether there was an agreement to share losses or a reasonable expectation that there would be no losses is a fact issue to be resolved by the jury.

### 5.  Preliminary Agreement

Finally, the Krah Defendants separately argue that they are entitled to summary judgment because the parties' collaborations amounted to at most preliminary discussions, with a final agreement between them never coming to fruition.  Krah Br. at 26-27.  Drawing all inferences in favor of Plaintiffs, the Court finds that there are issues of material fact in this regard.

"Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements." *Adjustre Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998). "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite Sys.*, 145 F.3d at 548). On the other hand, "[e]ven where the parties acknowledge that they intend to hammer out details of an agreement subsequently, a preliminary agreement may be binding," if, for instance, the parties otherwise reach an "essential understanding of . . . each party's contribution and potential exposure." *Richbell*, 765 N.Y.S.2d at 581.

Whether the parties reached agreement on the material terms of such a joint venture — including equity splits, roles, responsibilities, and voting rights — is a genuine issue of material fact that cannot be resolved at this time. Plaintiffs plausibly argue that the joint venture was formed to pursue corporate opportunities related to modernizing irrigation systems in the Pacific Northwest using HDPE piping. That is, the joint venture preceded the corporate entity that was requested by Medalist, and was focused on procuring, among other things, financing and exclusive rights to Krah Germany's technology. Pl. Opp. at 20 n.17. Although the Krah Defendants maintain there is an "absence of any evidence" corroborating that the parties "came to terms," Krah Opp. at 12, this oversimplifies and mischaracterizes the evidentiary record. The Hodnetts sent multiple emails regarding roles and responsibilities to the Krah Defendants, some of which were ultimately escalated as agreed-upon terms to Medalist. *See, e.g.*, Dkts. 235-2, 235-3, 253-4, 235-8, 235-63. With the exception of Theetge raising concerns regarding his equity splits, the Krah Defendants did not raise any concerns in response to those emails. Importantly, Cynthia testified that the Hodnetts and the individual

Krah Defendants reached agreement on terms on the morning of the December 10, 2019
meeting with Medalist.  Dkt. 199-2 at 362:9-63:18.  Testimony and emails from Plaintiffs
further suggest that the Krah Defendants later stepped back from the "original terms" that had
been agreed upon by all parties.  The existing record therefore supports two at least equally
plausible inferences: (1) that the parties never came to terms, as the Krah Defendants urge, or
(2) that the parties reached agreement, but that Theetge and the other Krah Defendants
subsequently reneged on those terms.  *See, e.g.*, *Ramgoolie v. Ramgoolie*, No. 16-cv-03345
(VEC) (SN), 2018 WL 5619959, at *10 (S.D.N.Y. Aug. 3, 2018) (finding genuine dispute of
material fact where parties "provided conflicting accounts" as to whether agreement had been
reached to establish a business and share profits), *report and recommendation adopted as
modified on other grounds*, 2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018).

As for the Krah Defendants' contention that the parties expressly contemplated that
any agreement would be reduced to writing, it was *Medalist* that required an operating
agreement as a condition precedent to formalizing any relationship with PIPINGusa LLC.  Pl.
RSUF ¶¶ 123-24; Dkt. 199-7 at 166:11-167:9.  There is no suggestion, however, that the
Hodnetts and Krah Defendants understood their relationship vis-à-vis one another to be
contingent on a written agreement.  To the contrary, Plaintiffs' theory of a joint venture is not
premised on a written agreement (preliminary or final), but on an "implied agreement evinced
by the parties' conduct."  *Richbell*, 765 N.Y.S.2d at 584.  For that reason, the Krah
Defendants' authorities — which primarily involve preliminary written agreements between
prospective co-venturers with express conditions precedent to the formation of a joint
venture — are inapposite.  *See, e.g.*, *Solutia*, 456 F. Supp. 2d at 435-38, 444 (no joint venture
where parties' joint venture agreement provided parties' obligations "would be conditioned on
future approvals" and "the occurrence of various conditions precedent"); *Adjustrite*, 145 F.3d

at 546, 550-51 (proposal for asset purchase was not a final agreement between parties where, among other things, it called for the execution of "a letter of intent, a sales agreement, and two employment contracts"); *Brown*, 420 F.3d at 152-55 (parties' memorandum of understanding ("MOU") was nonbinding where the MOU itself contemplated a formal contract to be entered into in the future). And in any event, "[t]he intention to commit an agreement to writing will not prevent contract formation prior to execution" where the parties conduct is otherwise consistent with the requisite indicia of a joint venture. *Richbell*, 765 N.Y.S.2d at 583.

In light of the foregoing, any disputes between the parties with respect to whether the terms discussed were in fact agreed upon or only preliminary discussions are effectively issues of credibility and fact best reserved for the jury.

### B.  Breach of Fiduciary Duty

Having found fact issues as to whether a joint venture was created, the next question is whether the Krah Defendants are entitled to summary judgment because no reasonable fact finder could find that there was a breach of fiduciary duty even if a joint venture was formed.

"Joint adventurers . . . owe to one another, while the enterprise continues, the duty of the finest loyalty." *Solutia Inc.*, 456 F. Supp. 2d at 442 (omission in original) (citation omitted); *see also Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GB), 2004 WL 2914093, at *10 (S.D.N.Y. Dec. 15, 2004) ("Parties who are joint venturers, or who share a fiduciary or confidential relationship, owe a duty of good faith, utmost loyalty and fair dealing to each other."). Deriving from the duty of loyalty, "[t]he doctrine of corporate opportunity provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Stavroulakis v. Pelakanos*, 106 N.Y.S.3d 725, 2018 WL 846677, at *11 (Sup. Ct. 2018) (unreported disposition) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen*,

542 N.Y.S.2d 530, 533 (App. Div. 1989)).  "In this context, '[a] corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business.'"  *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023) (alteration in original) (quoting *Moser v. Devine Real Est., Inc. (Fla.)*, 839 N.Y.S.2d 843, 848 (App. Div. 2007)).  "The bottom line is that when there is an internal struggle within a corporation as to the methodology for realizing a tangible corporate opportunity, one faction may lose that struggle, but the corporation does not."  *Memory Film Prods. v. Makara*, No. 05-cv-03735 (BMC), 2008 WL 11434484, at *8 (E.D.N.Y. Sept. 5, 2008), *aff'd sub nom. Memory Film Prods v. Schindley*, 356 F. App'x 566 (2d Cir. 2009) (summary order).  "The doctrine is limited, however, to circumstances where the corporation has a 'tangible expectancy' in the opportunity."  *Kraus USA, Inc. v. Magarik*, No. 17-cv-06541 (ER), 2020 WL 2415670, at *9 (S.D.N.Y. May 12, 2020) (quoting *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998)); *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 672 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006).

Plaintiffs appear to allege two grounds for their breach of fiduciary duty claim: (1) Defendants' alleged diversion of PIPINGusa's corporate opportunities to themselves; and (2) Defendants' alleged use of PIPINGusa's confidential information, including draft lease and operating agreements, for purposes of completing the Krah USA transaction with Medalist.  The Krah Defendants respond that: (1) any joint venture between the parties terminated as of December 11, 2019, and (2) Plaintiffs' corporate opportunity claim is a derivative claim that cannot be brought by Plaintiffs in their individual capacities.  The Court addresses these points in turn.

### 1. Termination of Joint Venture

According to the Krah Defendants, any joint venture was "indisputably terminated" as of December 11, 2019 — "when the Krah Defendants told the Hodnetts in clear an[d] unambiguous terms that their relationship was terminated," Krah Br. at 27 — thereby concluding any fiduciary relationship that may have existed between the parties. *Id.* at 28. Plaintiffs dispute that the parties terminated their joint venture as of December 11, 2019, but maintain that even if the joint venture was terminated as of that date, the Krah Defendants nevertheless still owed Plaintiffs certain fiduciary duties.

"An oral agreement to form a partnership for an indefinite period creates a partnership at will . . . ." *Kid Cloz, Inc.*, 320 F. Supp. 2d at 172  (quoting *Prince v. O'Brien*, 650 N.Y.S. 2d 157, 158 (App. Div. 1996)). "Under New York law, an at-will joint venture may be dissolved 'when either party manifests an unequivocal election to cease the collaboration,'" as evidenced by "conduct as well as words." *Fisher*, 692 F. App'x at 56 (quoting *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001)).

On December 11, 2019, Brad sent an email to Thalacker and Theetge stating that the "deal has come to a screeching halt" and that "[i]f there is not an amicable solution immediately, we will notify Krah and Medalist that the deal is off." Dkt. 44-6.  That evening, on a call with Theetge, Brad warned that, if the parties did not agree to the supposed "original" terms of the deal (including no equity for Theetge), Brad's lawyers would "fuck up Kr[a]h and fuck up everything in the United States." Dkt. 195-23 at 6:20-7:1; *id.* at 3:7-17, 5:22-6:19.  Most relevant to the question of termination, following a call with Brad, Theetge wrote to the Hodnetts, Thalacker, and Graybeal, stating: "Good luck on you[r] venture with Pipingusa." Dkt. 195-28.  Thalacker subsequently notified Medalist that they did "not have an agreement among the members." Dkt. 215-29 at 2.  Early the next morning, Theetge wrote to

Graybeal and Thalacker, asserting: "This is not for me, sorry.  You need to work out what you have started with Brad without me.  If Medalist with out [*sic*] me will do the deal, great for you and good luck. . . . *You have enough for a team now as it was top heavy from the beginning*."  Dkt. 229-6 (emphasis added).  Taken together, and again drawing all inferences in favor of the nonmoving party, this correspondence does not amount to an "unequivocal" termination of the parties' joint venture as a matter of law; the conversations could just as readily suggest the continuance of the joint venture — albeit without Theetge.

Defendants' cited authorities do not persuade the Court otherwise.  In *Fisher v. Tice*, in addition to a July 2010 email exchange between the parties agreeing to "go our separate ways" and plaintiff's admission that "the wheels came" off their venture, the parties underwent a "protracted period of silence and inactivity."  692 F. App'x at 56.  It was "undisputed" that the parties "did not communicate at all regarding their venture for nearly two years following their July 2010 email exchange," and that plaintiff "did not work on the venture during this entire period."  *Id.*  Under those circumstances, the Second Circuit concluded that the evidence "establish[ed] an 'unequivocal election' to terminate the alleged joint venture."  *Id.*  And in *Scholastic, Inc. v. Harris*, there was evidence that, among other things, Scholastic's attorneys expressly informed the co-venturer's representatives that "the joint venture was terminated and that they believed [appellee] was thus not entitled to [stock appreciation rights]."  259 F.3d at 87.

Those are not the circumstances here.  Not only did the Krah Defendants undertake measures to start their own business just a day after the purported termination of the parties' agreement, but a reasonable fact finder could conclude that there was also no express termination of the venture as between the Hodnetts, Graybeal, and Thalacker.  Theetge's email on the morning of December 12, 2019, suggests that the joint venture would continue

without him, *see* Dkt. 229-6, and Hodnett's email to Thalacker and Graybeal on December 13, 2019, asking "what is going on," Dkt. 215-36, suggests Brad at least did not understand the joint venture between the three parties to have terminated.  Certainly, as of December 11, 2019, the parties' business relationship was disintegrating, but the Court cannot conclude as a matter of law that the parties had expressed an "unequivocal" intent to terminate the joint venture.  *See Scholastic, Inc.*, 259 F.3d at 87 ("If — and when — the joint venture was dissolved is a prototypical fact question that a jury must determine.").

In any event, as Plaintiffs note, the entirety of a fiduciary's duties do not immediately cease upon the fiduciary's withdrawal from, or the termination of, a joint venture.  Even post-departure, a former corporate fiduciary is prohibited "from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation."  *Am. Fed. Grp.*, 136 F.3d at 906.  "The doctrine focuses on the corporation's 'tangible expectancy' in the opportunity instead of on the former employee's status with the corporation when he diverts the opportunity to his own benefit."  *St. John's Univ. v. Bolton*, 757 F. Supp.2d 144, 170-71 (E.D.N.Y. 2010).  "Thus, the doctrine applies to opportunities an employee learns about during the course of his employment even after the employment relationship is terminated."  *Id.* at 171 (citing *Abbott*, 475 F.2d at 88); *see also Memory Film Prods.*, 2008 WL 11434484, at *7 ("[A]lthough fiduciary obligations usually cease upon termination of a directorship, even a short-term director cannot leave in order to take a corporate opportunity that she worked on with her." (citation omitted)); *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 88 (2d Cir. 1973) (former employee "had an obligation which carried over after he left [company] not to exploit projects which would have clearly brought profits to [company] but for his competition"); *Am. Fed. Grp.*, 136 F.3d at 906 ("[The corporate

opportunity] doctrine applies even after one owing fiduciary duties leaves his corporate employment.").

Moreover, the record reflects that there was no material difference between the contract previously signed by Theetge on behalf of PIPINGusa and the one signed on behalf of Krah USA, *see* Thalacker Dep. at 342:2-343:11; Richter Dep. at 389:7-9, and the later Medalist loan agreement was substantively identical to the prior draft PIPINGusa loan agreement, Df. RSUF ¶¶ 191-192. "[E]ven former employees may not misappropriate and utilize confidential information . . . available only to employees in their endeavors for the company." *Am. Fed. Grp.*, 136 F.3d at 906. A "former employee may, of course, go into competition with his ex-employer and can use general information concerning the method of business and names of customers of his ex-employer in his new venture. But he cannot . . . utilize specific information he obtained during his employment to deprive his ex-employer of customers with whom he knows a deal is in the process of completion." *Abbott*, 475 F.2d at 89 (citation omitted).

For the foregoing reasons, the Court finds that there is a genuine issue of material fact as to whether the parties' joint venture was "unequivocally" terminated by December 11, 2019. Even if a jury determines the parties did terminate the venture, however, there are issues of fact as to whether Defendants' prompt post-termination conduct in fact constituted breaches of fiduciary duty, including whether the Krah Defendants impermissibly repurposed the joint venture's confidential information in service of Krah USA's agreement with Medalist.

### 2. Nature of Plaintiffs' Claim

The Krah Defendants separately argue that Plaintiffs' breach of fiduciary claim is really predicated on a diversion of a corporate opportunity belonging to *PIPINGusa LLC*, and

is therefore an impermissible attempt by Plaintiffs to resurrect a derivative claim on behalf of PIPINGusa LLC.  Krah Opp. at 25-26.  The Krah Defendants assert that "Thalacker, Graybeal, and Theetge were never members of PIPINGusa, LLC . . . and, thus, owed no fiduciary duty to the company."  *Id.* at 25.  The Court disagrees with this argument.

Although "plaintiff's claims are . . . classically derivative, there is some . . . authority that permits the maintenance of a claim for direct recovery . . . by an oppressed shareholder in a closely held corporation where all of the other shareholders are the liable defendants." *Stavroulakis*, 2018 WL 846677, at *13.  "[I]n certain situations, a direct recovery to the plaintiff may be more appropriate" than recovery to the corporation, including, for instance, where the shareholder "has sustained a loss disproportionate to that sustained by the corporation."  *Id.* at *14 (citation omitted) (emphasis omitted).  Here, Plaintiffs allege that the Krah Defendants "breached fiduciary duties [they] owed to plaintiffs independent of the duties [they] owed to the holding company."  *Id.* (citation omitted).  Indeed, in *Hodnett I*, Judge Vyskocil found that Plaintiffs had stated both a derivative and direct claim for breach of fiduciary duty against the Krah Defendants.  *See* 2022 WL 4072935, at *9-10; *see also Tatinsian v. Vorotyntsev*, No. 16-cv-07203 (GHW), 2018 WL 2324998, at *3 (S.D.N.Y. May 22, 2018) ("Direct and derivative claims have also been allowed to move forward simultaneously where the plaintiffs and the defendants were the only shareholders of the company, such that recovery on either the direct or the derivative claim would inure to the benefit of the same individuals."); *Solutia Inc.*, 385 F. Supp. 2d at 333 ("[Defendant] owed an independent duty arising from its joint venture relationship that also confers standing on [plaintiff].").  "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty."  *Solutia Inc.*, 385 F. Supp. 2d at 333.  Since the

parties are alleged to have been joint venturers, the Krah Defendants owed the Hodnetts a duty of loyalty separate and apart from any duties they may have owed to the corporate entity.

*       *       *

For all of these reasons, summary judgment is denied on Plaintiffs' claims for breach of fiduciary duty.

## II.   Aiding and Abetting Breach of Fiduciary Duty

The Court next turns to the Plaintiffs' aiding and abetting claim against the Medalist Defendants.  "A claim for aiding and abetting a breach of fiduciary duty under New York law requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Johnson*, 660 F.3d at 142 (alteration adopted) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003)).  "Actual knowledge of the breach of fiduciary duty is required, constructive knowledge will not suffice."  *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 525 (S.D.N.Y. 2010).  "A defendant only knowingly participates in a breach of fiduciary duty 'when he or she provides "substantial assistance" to the primary violator,' which 'occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'"  *Id.* (quoting *Kaufman*, 760 N.Y.S.2d at 170).  Aiding and abetting liability "does not require wrongful intent by the third party, but only 'that the third party knew of the breach of duty and participated in it.'"  *Johnson*, 660 F.3d at 142 (citation omitted).  "However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."  *Kaufman*, 760 N.Y.S.2d at 170.

Plaintiffs argue that the Medalist Defendants "acted in concert with" the Krah Defendants "to aid them in their breach of fiduciary duties." Pl. Br. at 26. Specifically, Plaintiffs contend that Richter and Regan:

> (i) urged Theetge to make a last-minute gambit to renegotiate his interest in PIPINGusa; (ii) perpetuated Theetge's lie that Medalist "required" he be granted equity in PIPINGusa through their willful failure to correct the falsehood; (iii) provided certainty to the [Krah] Defendants that Medalist would fund Krah USA in lieu of PIPINGusa; and (iv) facilitated the loss of PIPINGusa's exclusive relationship with Krah Germany by positioning Krah USA to sign a substitute agreement with Krah Germany immediately upon PIPINGusa's failure to make the required down payment.

*Id.*

Whether the Medalist Defendants had the requisite knowledge to aid or abet any alleged tortious act committed by the Krah Defendants is itself an open question. Medalist had only ever seen draft operating agreements *disclaiming* any fiduciary relationship between the parties. *See, e.g.*, Dkt. 213-56 § 2.3. Therefore, a reasonable juror could infer that the Medalist Defendants did not have "actual" knowledge of a fiduciary duty between the parties (and therefore would not have been aware of any breach thereof).

But even if Medalist had the requisite knowledge, Plaintiffs have not pointed to any evidence from which a juror could infer that Medalist "substantially assisted" the Krah Defendants. There is no factual basis from which to infer that the Medalist Defendants "agitated" Theetge, prompting the breakdown in negotiations. To the contrary, Theetge raised concerns with respect to his proposed equity split as early as November 19, 2019 — weeks prior to any purported discussion regarding the matter with Richter or Regan. Dkt. 195-10 at 1. Moreover, the undisputed evidence shows that the Medalist Defendants merely instructed the parties to determine equity splits amongst themselves, ensuring that ownership rights were

commensurate with their respective obligations and roles in the company.  Dkt. 200-9 at

30:19-31:13.  In any event, even if the Medalist Defendants encouraged Theetge to seek

voting rights or equity, Theetge's attempt to negotiate a stronger position does not amount to a

breach of any fiduciary duty.  "If a party is dissatisfied with a contractual provision, 'the time

to say so is at the bargaining table.'"  *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, No. 22-

cv-08842 (JLR), 2024 WL 2853618, at *4 (S.D.N.Y. June 4, 2024) (quoting *Eujoy Realty

Corp. v. Van Wagner Commc'ns, LLC*, 4 N.E.3d 336, 343 (N.Y. 2013)).  That is precisely

what Theetge did.

　　　　To the extent that Plaintiffs' aiding and abetting claim is premised upon the Medalist

Defendants' funding of Krah USA, that theory separately fails for a lack of causation.  The

Krah Defendants' purported breach of their fiduciary duty — the diversion of the Krah GmbH

contract from PIPINGusa LLC to themselves — occurred independently of the Medalist

Defendants' funding.  The sequence of events is important.  Theetge purportedly withdrew

from PIPINGusa on December 11, 2019, and started Krah USA the next day, on December

12, 2019.  Krah Germany terminated its contract with PIPINGusa for a lack of funding on

December 13, 2019.  The Medalist Defendants did not fund Krah USA until days later, on

December 20, 2019, and only after receiving an executed operating agreement from Theetge,

Graybeal, and Thalacker.

　　　　To establish their aiding and abetting claim, Plaintiffs must show that the Medalist

Defendants were the "proximate cause" of Krah USA's diversion of the Krah Germany

contract; in other words, that Medalist's diversion of its funding was a "substantial factor in

the sequence of responsible causation, and . . .  the injury [was] reasonably foreseeable or

anticipated as a natural consequence."  *Diduck v. Kaszycki & Sons Contractors, Inc*., 974 F.2d

270, 284 (2d Cir. 1992) (first quoting *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp*.,

602 F.2d 478, 484 (2d Cir. 1979); and then quoting *Hecht v. Com. Clearing House, Inc.*, 897

F.2d 21, 23-24 (2d Cir. 1990)), *abrogated on other grounds by Gerosa v. Savasta & Co., Inc.*,

329 F.3d 317 (2d Cir. 2003).  But Medalist's "dealings with [Krah USA] *after* the alleged

breach occurred were not a substantial factor causing [Plaintiffs] any harm." *Catskill Dev.,*

*L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 136 (2d Cir. 2008) (Sotomayor, J.).  Graybeal,

Thalacker, and Theetge had already committed to a new venture as of at least December 13,

2019 (Theetge indisputably as of December 12, 2019), and Medalist did not agree to fund the

new entity until *after* PIPINGusa lost the ability to close on the Krah Germany agreement.

More importantly, the undisputed evidence demonstrates that Medalist was not even the but-

for cause of Plaintiffs' injury, let alone the proximate cause: Medalist would not have funded

an entity comprised of only the Hodnetts to secure exclusive rights to Krah Germany's

technology.  Dkt. 47 ¶¶ 9, 11.  *See, e.g.*, *Diduck*, 974 F.2d at 284 ("Whether the aid rendered

is 'enough' to warrant the imposition of liability is essentially a proximate cause inquiry. . . .

[B]ut for causation is not sufficient . . . .").  Therefore, Medalist's funding of Krah USA did

not aid or abet a breach of fiduciary duty as a matter of law, because there are no facts from

which a jury could find that it proximately caused the loss of a corporate opportunity.[6]

   The Second Circuit's decision in *Catskill Development, L.L.C. v. Park Place*

*Entertainment Corp*. is instructive.  There, a casino development group and land developer

brought an action against a competitor for tortious interference with prospective business

relationships in connection with the development and management of a Native American

casino.  547 F.3d at 119.  Among other things, plaintiffs argued that the defendant, Park Place,

---

[6] Whether Medalist's execution of a loan agreement with Krah USA violated the terms of
PIPINGusa and Medalist's NDA is a separate question.  However, for the reasons set forth
below, Plaintiffs' breach of contract claim against the Medalist Defendants separately fails
due to a lack of standing.

"knowingly participated in a breach of fiduciary duty owed to the Tribe by . . . the principal of the manager of the Tribe's Akwesasne casino." *Id.* at 134. Plaintiffs alleged that the casino's manager "attempt[ed] to put a financial 'squeeze' on the Tribe, with the ultimate aim of inducing the Tribe to look to Park Place for a financial bailout," and did so based on a significant fee allegedly promised to him by Park Place. *Id.* In rejecting the plaintiffs' aiding-and-abetting claim on summary judgment, the Second Circuit underscored that financial support alone is not a basis for an aiding-and-abetting claim: "[E]ven if Park Place had assured [the principal] of financial comfort to induce his alleged breach of duty, we believe that assurance is insufficient, on its own, to establish the participation necessary to support a claim." *Id.* As for plaintiffs' theory that Park Place "ratif[ied]" the manager's breach, the Second Circuit found that "Park Place's dealings with [the principal] *after* the alleged breach occurred were not a substantial factor causing the Catskill Group any harm." *Id.* The Second Circuit further underscored that the "knowing acceptance of benefits alone" was likewise "insufficient to sustain a claim for *participating* in the breach of a fiduciary duty." *Id.* at 136.

*Catskill*'s reasoning thus forecloses Plaintiffs' aiding-and-abetting claim. Here, Medalist's continued association with, and funding of, the Krah USA venture did not contribute to Plaintiffs' harm. The alleged breach of the Krah Defendant's fiduciary duty to Plaintiffs had already occurred when Theetge formed a separate company; Graybeal and Thalacker joined; and Graybeal, Thalacker, and Theetge executed a new agreement on behalf of Krah USA with Krah Germany. Even if Medalist provided the Krah Defendants "financial comfort" to induce their alleged breach of their duty, that is an insufficient basis for an aiding and abetting claim under *Catskills*.

Plaintiffs' authorities, all of which are in different procedural postures and are factually distinguishable, do not counsel a different result. For example, in *American Baptist*

*Churches of Metropolitan New York v. Galloway*, the court drew all inferences in favor of plaintiff on a motion to dismiss and held that the pleadings "support[ed] a theory that all defendants acted in concert" to divert a corporate opportunity from plaintiffs, observing that "what the parties actually knew is a matter for discovery." 710 N.Y.S.2d 12, 17 (App. Div. 2000). In concluding that the defendants acted in concert, the court observed that the alleged co-conspirators had actually formed the competing entity to which the defendants allegedly diverted plaintiffs' corporate opportunity. *Id.* No such facts regarding Medalist's participation in the formation of Krah USA exist here. *Kraus USA, Inc. v. Magarik* likewise resolved a motion to dismiss, and also involved factually distinguishable circumstances: there, the alleged co-conspirator was a longtime competitor of plaintiff, and received plaintiff's trade secrets in exchange for investing in defendant's competing company. 2020 WL 241567 at *1.

Thus, the Court finds that Plaintiffs cannot establish, as a matter of law, an aiding-and-abetting claim against the Medalist Defendants. The Medalist Defendants' motion for summary judgment as to Plaintiffs' aiding-and-abetting claim is therefore granted.

## III.    Breach of Contract

Plaintiffs and the Medalist Defendants likewise cross-move for summary judgment on Plaintiffs' breach of contract claim against the Medalist Defendants. "To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (citation omitted) (international quotation marks omitted).

According to Plaintiffs, the Medalist Defendants breached three provisions of a confidentiality agreement entered between PIPINGusa and Medalist: a nondisclosure clause, a nonsolicitation provision, and a noncircumvention clause. Pl. Br. at 5-7. The Medalist

Defendants argue that (1) Plaintiffs lack standing to assert a breach of contract claim premised on the NDA in their individual capacity, and (2) even if they had standing, Plaintiffs cannot establish breach as a matter of law.  Medalist Br. at 11-18.

For the reasons set forth below, the Court finds that the Hodnetts lack standing to assert a claim premised on the parties' NDA, and therefore need not address whether the Medalist Defendants in fact breached the contract's terms.

### A.  Standing

The Medalist Defendants argue that Plaintiffs' breach of contract claim "seeks remedies on behalf of PIPINGusa, LLC, not Brad individually," and that Plaintiffs therefore can only bring their claim in a derivative capacity, which the Court has already dismissed.  Medalist Reply at 6.  Plaintiffs, on the other hand, argue that the Hodnetts suffered a direct injury as a result of the Medalist Defendants' purported breach of the NDA, and that they are therefore entitled to assert a direct claim against the Medalist Defendants.  Pl. Opp. at 36-37.

"A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[] an intent to permit enforcement by the third party' in question."  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)).  "Under New York law, where a party to a contract signs the document only in his capacity as corporate officer, he may not maintain an action on the contract in his individual capacity."  *Kirby v. Coastal Sales Ass'n*, 82 F. Supp.2d 193, 197 (S.D.N.Y. 2000) (finding that president of corporate entity lacked standing to bring action on contract where he signed contract only in his representative capacity and while corporate charter was suspended).  Indeed, a "joint venture may not assert the claims of its members and its

members may not assert claims on its behalf." *Intellivision v. Microsoft Corp*., 784 F. Supp. 2d 356, 366 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616 (2d Cir. 2012) (summary order).

Here, it is undisputed the NDA's preamble stated that the confidentiality agreement was between "Medalist Partners Opportunity Master Fund II-A, L.P. . . . and PIPINGusa . . . ." Dkt. 213-18 at 4. Likewise, it is undisputed that Brad Hodnett expressly signed in a representative capacity on behalf of PIPINGusa. *See* Dkt. 213-18 at 7. As Defendants note, at the time that the parties' NDA was executed, PIPINGusa LLC was not yet an incorporated entity. But the analysis for purposes of standing remains the same whether Brad Hodnett is construed as having signed on behalf of PIPINGusa LLC the corporate entity, or PIPINGusa the alleged joint venture, because like a company and its members, "a joint venture may not assert the claims of its members and its members may not assert claims on its behalf." *Intellivision*, 784 F. Sup. 2d at 366. Therefore, any claims pursuant to the NDA belong to PIPINGusa LLC or the alleged joint venture PIPINGusa, not Brad Hodnett.

Plaintiffs, however, argue that they still have standing to bring their breach of contract claim because they suffered a direct injury as a result of Medalist's purported breach of the NDA. To be sure, "where the plaintiff's injury is direct, the fact that the corporation may also have been injured and could assert its own claims does not preclude the plaintiff from asserting its claim directly." *Solutia Inc*., 385 F. Supp. 2d at 331 (alteration adopted) (quoting *Excimer Assocs., Inc. v. LCA Vision, Inc*., 292 F.3d 134, 140 (2d Cir. 2002)). "[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct." *Excimer Assocs.*, 292 F.3d at 139-40 (citation omitted). "Such a direct injury occurs, for example, if 'the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged.'" *Solutia Inc*., 385 F. Supp. 2d at 331 (citation

omitted); *see also In re 305 E. 61st St. Grp. LLC*, 130 F.4th 272, 281 (2d Cir. 2025) (holding

that "[e]ven though the plaintiff could not prevail on [his] claim without also showing an

injury to the company, the claim was direct because it was based on a [contractual] right

belonging to the plaintiff personally").

   Plaintiffs have no grounds to assert a direct claim here.  The Medalist Defendants

owed the Hodnetts no duty independently of the representations and warranties made to

PIPINGusa LLC under the parties' NDA.  To the extent that the Medalist Defendants

breached the NDA's terms, the Hodnetts are impacted only insofar as they are members of

PIPINGusa LLC — the contractual counterparty — with ownership interests in the entity.  *See*

*Bischoff v. Boar's Head Provisions Co.*, 436 F. Supp. 2d 626, 633 (S.D.N.Y. 2006) (holding

that plaintiff's claims were derivative where plaintiff had "alleged significant personal losses

but only as a result of [the company's] losses of several hundred million dollars due to

defendants' alleged misconduct"); *Solutia Inc.*, 385 F. Supp. 2d at 336 (finding that breach of

contract harms "first and more foremost" the contracting party, and, "for [non-contracting

plaintiff] to have standing to sue on these breaches for its own account, an independent duty

must run from [defendant] to [plaintiff] that bears on the claims"); *In re Cavalry Constr., Inc.*,

428 B.R. 25, 35-36 (S.D.N.Y. 2010) (finding that appellee's injury was an indirect injury

where "the clear language" of the contract established "duties running from [appellant] to the

[j]oint [v]enture, and not fiduciary duties running from [appellant] to [appellee]"), *aff'd*, 425

F. App'x 70 (2d Cir. 2011) (summary order).[7]

---

[7] Having found that Plaintiffs' claims against the Medalist Defendants should be dismissed as
a matter of law, the Court need not reach the Medalist Defendants' arguments that Plaintiffs'
other requested remedies, including a constructive trust, punitive damages, and injunctive
relief, should be dismissed.

The Court therefore dismisses Plaintiffs' breach of contract claim against the Medalist Defendants for lack of standing.

## IV.    Damages

Finally, through reliance on the Medalist briefing, the Krah Defendants argue that Plaintiffs cannot establish that they are entitled to damages of (i) $6,996,000 to $13,992,000.00 in lost profits; (ii) $1,237,500.00 in unpaid salaries; and (iii) $22,919.96 in expenses Plaintiffs purportedly advanced to start the piping business. *See* Krah Br. at 28-29; Medalist Br. at 19.[8]

### A.  Lost Profits

Turning first to lost profits, the Krah Defendants argue that Plaintiffs have not shown, with reasonable certainty, the lost profits that Plaintiffs are owed.  This Court agrees.

"[T]o recover damages for lost earnings or profits one must prove with certainty that the loss was caused by a breach of contract or fiduciary duty, and must prove with reasonable certainty, though not mathematical precision, the amount of the loss . . . ."  *Am. Fed. Grp.*, 136 F.3d at 907-08 (citations omitted).  "[E]vidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate.  Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty."  *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citation omitted) (quoting *Kenford*

---

[8] The Medalist Defendants also argue that Plaintiffs' other remedies should be foreclosed, including Plaintiffs' request for a constructive trust, punitive damages, and injunctive relief. *See* Medalist Br. at 26-27.  Since the Court has rejected the claims against the Medalist Defendants as a matter of law, and because the Krah Defendants do not incorporate by reference this portion of the Medalist Defendants' briefing, Krah Br. at 28-29 (incorporating Point III of Medalist Defendant's memorandum), the Court does not reach these arguments with respect to the Krah Defendants.

*Co. v. Erie County*, 493 N.E.2d 234, 236 (N.Y. 1986)).  The law does not stretch, however, as far as Defendants would like — there is no *per se* rule precluding lost profits "where a company, like PIPINGusa LLC, is in the 'development stage' and has never generated any revenue."  Medalist Br. at 19 (quoting *Digit. Broad. Corp. v. Ladenburg, Thalmann & Co*., 883 N.Y.S.2d 186, 187 (App. Div. 2009); *Bersin Props., LLC v. Nomura Credit & Cap., Inc.*, 159 N.Y.S.3d 828, 2022 WL 433654, at *16 (Sup. Ct. 2022) (unpublished table decision)).  In fact, the Second Circuit has expressly disclaimed a "per se rule forbidding the award of lost profits damages to new businesses." *Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir. 1996) (per curiam).  Accordingly, while the Court does not go so far as to find that calculations of lost profits for a new business are inherently unreliable, it recognizes that plaintiffs must provide a greater "quantity and quality of evidence . . . to prove lost future profits with 'reasonable certainty.'"  *Coastal Aviation, Inc. v. Commander Aircraft Co*., 937 F. Supp. 1051, 1066 (S.D.N.Y. 1996) (quoting *Kenford*, 493 N.E.2d at 235).

Here, Plaintiffs have not marshalled sufficient evidence from which a reasonable fact finder could find that lost profits have been established with reasonable certainty.  For their lost-profits calculation, Plaintiffs rely solely on their damages expert's report, which in turn is premised in large measure on PIPINGusa LLC's November 2019 projections.  In reliance on the November 2019 projections, Plaintiffs' expert Quintero concludes that the damages sustained by the Hodnetts amount to $6,996,000, and that if the Court determines that the Hodnetts are entitled to recover all damages sustained by all owners of PIPINGusa, the damages owed increases to $13,992,000.  Dkt. 206-9 at 4.  The problem for Plaintiffs is that Quintero's opinion seeks to extrapolate damages for an unproven business, selling a novel product, in yet untapped markets.  Daubert Br. at 10-18.  The underlying November 2019 projections that are the basis for Quintero's report are themselves predicated on various

assumptions, including that PIPINGusa LLC would be able to penetrate new markets consisting of municipalities and the Department of Transportation, and that it would be able to do so by 2020/2021.

Alan Horton, a third-party consultant who helped prepare the projections over a two-year period, himself identified new market sales as the "biggest variable" in the financial projections. Dkt. 208-4 at 34. Indeed, 70 percent of sales projections through 2024 are attributable to penetrating a brand-new segment of the market (municipalities and the Department of Transportation). Dkt. 208-3 at 10 ("New Sales" data); *see also* Dkt. 208-4 at 34. Moreover, 24 percent of revenue from new sales of Krah pipe was projected to occur by 2022. Dkt. 208-3 at 10. And to the extent that the projections (and Quintero's reliance thereon) depended in part on the competitive edge attributed to Krah USA's HDPE piping, the smaller irrigation districts — districts PIPINGusa was confident it could secure — were not expected to require that piping. Dkt. 208-4 at 12:19-13:20. Indeed, in Alan Horton's assessment, the adoption of Krah's new product by an uncertain market segment "is the thing that really drives ultimately the significant returns on this." *Id.* at 31:20-32:11. Tellingly, Krah USA has not met its projections. Dkt. 231 ¶ 95.

The leading New York authority on lost profits, *Kenford Co. v. County of Erie*, is instructive. In *Kenford*, the Court found that an expert's proof was "insufficient to meet the required standard" for establishing lost profits, notwithstanding that the expert's quantity of proof was "massive" and represented the "most advanced and sophisticated method for predicting the probable results of contemplated projects." 493 N.E.2d at 236. There, the expert's economic analysis "employed historical data, obtained from the operation of other domed stadiums and related facilities throughout the country," to identify the marketing prospects for a proposed sports stadium that was never constructed. *Id.* at 235; *see id.* at 236.

Notwithstanding the quality and quantity of evidence deployed, the court nevertheless concluded that assumptions pertaining to the stadium's profitability "require[d] speculation and conjecture," including that it would be successfully operated for 20 years, that it would host professional sporting events, and that it would be a venue for meetings and the like. *Id.* at 236. Likewise here, regardless of whether Quintero complied with the American Institute of Certified Public Accountants' ("AICPA") guidelines for calculating lost profits for new businesses, he still relies on assumptions that "require speculation and conjecture." *Id.*

Equally problematic, Quintero's methodology is flawed insofar as Quintero effectively undertook no measures to independently verify the assumptions underlying the November 2019 projections. Quintero did not, for instance, speak with potential market participants to understand the potential market or test assumptions in the business plan regarding market size. Dkt. 199-8 at 97:23-98:17. Nor did Quintero benchmark PIPINGusa LLC's projected profits against a comparable company with actual profit history. *Id.* at 98:4-8; *see, e.g.*, *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018) ("A company without past sales can prove lost profits by identifying a comparable company and analyzing that company's actual profit history."), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order). Quintero also did not interview Horton, who played a pivotal role in preparing the projections, or review deposition transcripts. Dkt. 199-8 at 107:3-20, 127:4-17. And while Quintero may have considered some of the AICPA-identified factors for calculating a new business's lost profits, he disregarded others, including the experience of other similarly situated businesses.

To argue that the projection's assumptions establish damages with reasonable certainty, Quintero relies primarily upon (1) the expertise of those who prepared the projections, and (2) Defendants' supposed reliance on the projections. Daubert Opp. at 19. But documents prepared for the purposes of securing funding are of questionable reliance.

*See, e.g.*, *Holland Loader Co*., 313 F. Supp. 3d at 481 (rejecting evidence of damages where documents and projections relied on by the expert were "prepared for the purpose of . . . securing funding" and did not "satisfy the requisite level of certainty in situations involving a new product with relatively little sales history" (citation omitted)); *Prepaid Ventures Ltd. v. Compton*, No. 18-cv-02102 (DLI), 2022 WL 18859053, at *20 (E.D.N.Y. Dec. 21, 2022) ("Even assuming *arguendo* that some or all defendants may have reviewed or had some 'involvement' in preparing the referenced data or projections, plaintiffs provide no proof of the reliability of those projections, which may well have been the product of unwarranted optimism and/or outright exaggeration." (footnote omitted)), *report and recommendation adopted as modified on other grounds*, 2023 WL 2662311 (E.D.N.Y. Mar. 28, 2023), *aff'd*, No. 23-596, 2025 WL 444643 (2d Cir. Feb. 10, 2025) (summary order); *Schonfeld*, 218 F.3d at 173 (rejecting assertion that damages calculation for a newly formed cable television corporation was reasonably certain because the parties, an established U.S. cable operator, and the BBC "all believe[d] that profits from the Channel were reasonably certain," and observing that "[t]he entrepreneur's 'cheerful prognostications' are not enough" (alteration in original) (citation omitted)); *Inficon, Inc. v. Verionix, Inc*., 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016) ("A defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history.").[9]  The involvement here of

---

[9] Plaintiffs do not meaningfully engage with this case law and instead cite to a single district court case from fifty years ago, *Perma Research & Development Co. v. Singer Co*., 402 F. Supp. 881 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 111 (2d Cir. 1976), for the proposition that "courts find projections to be a reliable basis for a lost-profits award when a defendant considered them before entering into a business arrangement."  Daubert Opp. at 18 (citing *Singer*, 402 F. Supp. at 901).  *Singer*, however, applied a "rational basis" test for calculating lost profits.  402 F. Supp. at 898; *see also id*. at 899 (finding that the evidence need only "provide[] a reasonable basis for concluding that lost profits were occasioned by the defendant's breach").  And *Kenford* expressly disclaimed *Singer*'s rational basis test, instead

nonprofits in the irrigation sector, which ostensibly still had a vested interest in the

development and application of PIPINGusa LLC's novel technology, does not increase the

reliability of these projections, and indeed both of the nonprofits that reviewed PIPINGusa's

business plan and pro forma projections ultimately declined to follow through on the

opportunity.  As for Medalist's supposed reliance on the financial projections,

contemporaneous documents show that Richter thought the projections "seem[ed] to[o] good

to be true."  Dkt. 228-5; *see* Dkt. 228-4.  And while Medalist approved the investment (Dkt.

199-16 at 196:25-198:16; Dkt. 200-11), it did so through an asset-backed loan, and its equity

in the company is valued at only $11,000.  Dkt. 200-10 at 4; Dkt. 215-6 at 423:16-424:14.

      Nor does Quintero's application of purportedly "conservative" assumptions counteract

the otherwise speculative nature of the PIPINGusa projections he relies upon to render his

damages calculation.  Plaintiffs point to the fact that Quintero applied a steep discount rate to

reflect the level of risk inherent in the projected profits, as well as a high probability multiplier

that the business would fail.  Daubert Opp. at 20.  But these conservative measures do not

cure the otherwise speculative assumptions underlying Quintero's analysis.  *See, e.g.*,

*Schonfeld*, 218 F.3d at 174 (finding that expert witness "failed to establish that [25% variance

on the projected cash flows] would adequately account for any inaccuracies in the revenue and

expense assumptions . . . as well as any changes in consumer demand"); *R.F.M.A.S. Inc. v. So*,

748 F. Supp. 2d 244, 275-76 (S.D.N.Y. 2010) ("[T]he admissibility of [the experts']

testimony as to damages is not saved by either the fact that their approach to calculating

---

requiring "reasonable certainty" of lost profits.  *See Kenford*, 493 N.E.2d at 236 ("We
specifically reject the 'rational basis' test enunciated in [*Singer*] and adopted by the Appellate
Division.").

damages might be appropriate in many other cases or the fact that their estimate of damages may actually understate the true extent of damage suffered by plaintiff.").[10]

To the extent that Plaintiffs argue that deficiencies with respect to lost profits calculations are best reserved for trial, many authorities decide the applicability of *Kenford* at the summary judgment stage.  In fact, *Washington v. Kellwood Co*., cited by Plaintiffs, expressly states that the availability of damages under *Kenford* is an inquiry best suited to "application of law to fact by a jury at trial *or by the court deciding some dispositive motion*." 105 F. Supp. 3d 293, 313 (S.D.N.Y. 2015) (emphasis added); *see also EVEMeta, LLC v. Siemens Convergence Creators Corp*., Nos. 651484/2016, 595821/2018, 2020 WL 6746630, at *9 (N.Y. Sup. Ct. Nov. 17, 2020) (granting summary judgment for failure to establish lost profits with reasonable certainty); *Upper Deck Co., LLC v. Breakey Int'l, BV*, 390 F. Supp. 2d 355, 360 (S.D.N.Y. 2005) (finding as a matter of law that manufacturer was not entitled to award for lost profits); *Schonfeld*, 218 F.3d at 172-73 (affirming district court's dismissal of damages claim for lost profits from new business venture on summary judgment and

---

[10] Some of these points also bear on the admissibility of Quintero's testimony under *Daubert*. That there is some crossover is unsurprising.  *See, e.g.*, *Schonfeld*, 218 F.3d at 173-75 (considering reliability of damages expert's testimony in assessing whether lost profits were established with "reasonable certainty").  As the court observed in *Washington v. Kellwood Co*., "the availability of damages under *Kenford* and the reliability of an expert's calculation of damages under *Daubert* are two related" — albeit "distinct" — inquiries.  105 F. Supp. 3d at 313.  "[T]he latter [is] a function of the court's gatekeeping authority and the former [is] better suited to application of law to fact by a jury at trial or by the court deciding some dispositive motion."  *Id.*  Even if this Court were to assess the reliability of Quintero's calculation of damages under the *Daubert* standard, it would separately deem Quintero's report unreliable under Rule 702 of the Federal Rules of Evidence, including because it attempts to extrapolate damages for an unproven business, relies on untested projections, and does not independently verify the assumptions underlying those projections.  *See, e.g.*, *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc*., No. 07-cv-07483 (RJH), 2010 WL 4892646, at *9 n.4 (S.D.N.Y. Dec. 2, 2010) (excluding expert report not because it "relied on assumptions," but because "those assumptions were entirely unfounded and unreliable, and that . . . reliance was therefore misplaced"), *aff'd*, 501 F. App'x 85 (2d Cir. 2012) (summary order).

excluding expert testimony); *Awards.com, LLC v. Kinko's Inc.*, 834 N.Y.S.2d 147, 154 (App. Div. 2007) (affirming grant of summary judgment on claim for lost profit damages where company "never made any profits"; "[p]laintiffs ha[d] not even identified any benchmark in the form of comparable businesses"; and the expert's report was "based on nothing but unverified assumptions about future profitability given to him by plaintiffs themselves"), *aff'd*, 925 N.E.2d 926 (N.Y. 2010); *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07-cv-00376 (JMB), 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) (observing that "courts often address the issue of lost profits at the summary judgment stage").

Accordingly, the Court concludes as a matter of law that Plaintiffs are not entitled to recover lost profits.

### 1. Unpaid Salaries

Plaintiffs claim that they are owed $275,000 in unpaid salaries for each year since the alleged breach, totaling $1,237,500.00. Dkt. 199-12 at 3. Defendants argue that Plaintiffs are not entitled to "recover their allegedly owed salaries because together they have sufficiently mitigated their alleged damages." Medalist Br. at 24-25. Defendants maintain that, for the period in question — that is, for 2020 through the first half of 2024 — Plaintiffs earned approximately $1,287,500 to $1,400,000 through alternative employment. *See id.* Therefore, according to Defendants, "Plaintiffs earned more than they would have received as part of the piping business." *Id.* at 25.

It is true, as Defendants note, that under New York law, "[t]he non-breaching party is . . . under a duty to mitigate damages to the extent practicable, and any proceeds generated from mitigation should be accounted for in the ultimate award of damages." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 n.21 (2d Cir. 2007) (citation omitted) (citing *Losei Realty Corp. v. City of New York*, 171 N.E. 899, 902 (N.Y. 1930)). It is also true

that Cynthia Hodnett testified that, from February 2020 through the date of her deposition (May 16, 2023), she was employed by Argus Advisory and received a salary of $211,000 plus commission, totaling approximately $300,000 annually. *See* Dkt. 206-2 at 499:11-500:20, 502:3-16. And she further testified that Brad had been self-employed since December 2019 and earned "[t]wenty [or] thirty" thousand dollars annually. *Id.* at 502:20-22, 503:8-16. That testimony does not, however, establish the Hodnetts' earnings from the date of Cynthia's deposition (May 16, 2023) to the present. The Court therefore agrees that Plaintiffs are entitled to have any mitigation of damages submitted to a trier of fact at trial.[11]

## V.    Defendants' *Daubert* Motion

Finally, Defendants jointly move to exclude the testimony of Quintero, the damages expert retained by Plaintiffs, pursuant to Federal Rule of Evidence 702. Daubert Br. Quintero opines solely on Plaintiffs' lost profits as a result of Defendants' conduct. Not only does the Court find Quintero's report to be unreliable under Rule 702, *see supra* at 68 n. 10, as the Court has already held that Plaintiffs are not entitled to lost profits, Quintero's opinion no longer has any relevance in this case and is therefore excluded. *See, e.g.*, *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 480 (S.D.N.Y. 2000) ("The trial court must not only determine whether the testimony is reliable; it must also determine whether an expert's

---

[11] The Medalist Defendants also argue that any purported expenses fronted by Plaintiffs for the business are the responsibility of the joint venturers, and that Plaintiffs are not entitled to attorneys' fees because the NDA did not have a fee shifting provision. Medalist Br. at 25. Likewise, the Medalist Defendants argue that Plaintiffs are not entitled to attorneys' fees because the NDA does not have a fee shifting provision. *Id.* The Court need not address these arguments since the claims against the Medalist Defendants have been rejected as a matter of law. The Krah Defendants do not make any arguments independently with respect to expenses or attorneys' fees, instead incorporating by reference Medalist Defendants' arguments. However, Medalist Defendants' arguments with respect to expenses and attorney's fees are not a basis for rejecting those damages as asserted against the Krah Defendants.

testimony is 'relevant to the task at hand,' namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." (first citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993); and then citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.  The Medalist Defendant's motion for summary judgment is GRANTED, and the Krah Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The Defendants' *Daubert* motion is GRANTED.  The Medalist Defendants are dismissed from this action.  The Clerk of Court is respectfully directed to terminate the motions at Dkts. 193, 198, 205, and 211.

This case will now proceed to a jury trial on Plaintiffs' breach of fiduciary duty claim against the Krah Defendants.  The Court directs the parties to promptly confer, and to submit a joint pretrial order and additional pretrial matters as specified in this Court's individual rules by October 7, 2025.  A jury trial will be held on December 1, 2025, and the Court will hold a final pretrial conference on November 18, 2025, at 1:00pm.

Dated:  September 9, 2025
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge